**Docket No. 02–7218.**

United States Court of Appeals, Second Circuit.

Argued Oct. 23, 2002.

Decided Dec. 11, 2003.

Amended April 2, 2004.

**Dwayne COBB and Jeffrey Rouse, Plaintiffs–Appellees,**

v.

**Rocco POZZI, individually and in his capacity as Commissioner of Correction for the County of Westchester, N.Y., Joseph Miranda, individually as Assistant Warden and as Chief of Operations of the Westchester County Department of Corrections and the County of Westchester, New York, Defendants–Appellants,**

**Andrew J. Spano, individually and in his capacity as County Executive of the County of Westchester, N.Y., Susan Tolchin, individually, Alan Scheinkman, individually and in his capacity as County Attorney for the County of Westchester, N.Y., Joan Waters, individually and in her capacity as Assistant County Attorney for the County of Westchester, N.Y. and John F. Gleason, individually, Defendants.**

92

Matthew T. Miklave, New York City (A. Jonathan Trafimow, Deborah S. Markowitz, Epstein Becker & Green, New York City, of counsel), for Appellants.

Jane Bilus Gould, White Plains, N.Y. (Lovett & Gould, White Plains, NY, of counsel), for Appellees.

Before: MESKILL, NEWMAN and POOLER, Circuit Judges.

MESKILL, Circuit Judge.

Plaintiffs-appellees Dwayne Cobb and Jeffrey Rouse (collectively "plaintiffs") brought this action pursuant to 42 U.S.C.

§ 1983 alleging that defendants-appellants Rocco A. Pozzi, Joseph Miranda, and the County of Westchester (collectively "defendants") disciplined them in retaliation for their association with their union in violation of their First Amendment rights and denied them equal protection of the laws in violation of the Fourteenth Amendment. Following a three day trial, the jury returned a verdict against each of the defendants and awarded each plaintiff $35,000 in damages.

The defendants seek review of the district court's orders (1) denying their motion to dismiss, (2) denying, in part, their motion for summary judgment, (3) denying their motion for judgment as a matter of law, and (4) denying their motion for a new trial.

## BACKGROUND

### The Parties

Plaintiffs Dwayne Cobb (Officer Cobb) and Jeffrey Rouse (Officer Rouse) are corrections officers who work for the Westchester County Department of Corrections (DOC). Like all corrections officers employed by the DOC, Officers Cobb and Rouse are members of the Corrections Officers' Benevolent Association (COBA). Defendant Rocco Pozzi (Commissioner Pozzi) is the Commissioner of the DOC, and defendant Joseph Miranda (Chief Miranda) serves as the DOC's Chief of Operations. Commissioner Pozzi and Chief Miranda occupy the first and third positions respectively in the chain of command at the DOC.

The County of Westchester (County), through the DOC, operates two separate correctional facilities in Valhalla, New York: the Penitentiary and the Jail. These facilities are within a two minute drive of each other. Corrections officers consider working in the Jail less desirable than working in the Penitentiary. As Officer Cobb testified at trial: "There are less problems [at the Penitentiary]."

As of July 1999, when the events giving rise to this action occurred, COBA and the County were engaged in negotiations for a new contract. The talks were at a stalemate and relations between the County and COBA were described as strained.

### Staffing at the Jail and Penitentiary in July 1999

Staffing issues at the Penitentiary and the Jail sometimes require that the DOC request corrections officers to work overtime. When scheduled officers call in sick and there are not enough volunteers for an overtime shift, the DOC can require what is called "forced overtime." According to DOC policy, forced overtime can only be required of individual officers who are still physically present at either correctional facility; once an officer leaves the premises, the DOC cannot require him to return to work forced overtime. Consequently, an officer is normally "forced" at the close of one of his regular shifts. As its label suggests, forced overtime is mandatory. It is also cross-institutional, meaning that the DOC can require an officer completing his shift at the Penitentiary to report immediately to the Jail for forced overtime duty.

On July 13, 1999, according to the testimony of several witnesses, there were rumors circulating throughout the Jail and Penitentiary that an unlawful "job action" may be in the works.[1] Chief Miranda testified that on July 13, 1999, he was told that numerous corrections officers who

---

1. Under New York's Taylor Law, "[n]o public employee or employee organization shall engage in a strike, and no public employee or employee organization shall cause, instigate, encourage, or condone a strike." N.Y. Civ. Serv. Law § 210(1) (2003).

would normally volunteer for overtime would not do so. Also, he was told that other corrections officers intended to put their names in the overtime log book to appear to be available but would not answer their phones when called.

Shortly before 3:00 p.m. on July 13, 1999, just prior to the start of the Jail's 3:00 p.m. to 11:00 p.m. shift, COBA representative Officer Christopher Smith instructed his fellow corrections officers at a pre-shift meeting that they should not sign up for overtime. (The DOC brought disciplinary charges against Officer Smith for giving this instruction.) Officer Smith testified that he understood that after he addressed his fellow officers, not enough officers volunteered to work overtime on the Jail's 7:00 a.m. to 3:00 p.m. shift on July 14, 1999.

This testimony is consistent with the affidavit of Sergeant John Reilly, a sergeant assigned to the 7:00 a.m. to 3:00 p.m. shift at the Jail. In it, he states that on July 13, 1999, fifty-one officers placed their names on a list for voluntary overtime and twenty-six of those officers agreed to take an overtime shift. Consequently, there was no need to exhaust the overtime list. According to Sergeant Reilly, July 13, 1999 represented a typical day of staffing at the correctional facility. The following day, July 14, 1999, was not typical. On that day, only thirty-one names appeared on the voluntary overtime list; several officers who regularly worked overtime removed their names from the list prior to the day's staffing. In addition, when the DOC placed calls to those officers who were on the volunteer overtime list, many did not answer their phones or return the DOC's call.

Sergeant Reilly's affidavit also observes that officers who chose to volunteer for overtime were harassed and intimidated. This observation is consistent with testimony offered at trial, which revealed that on July 14, 1999, after volunteering to work overtime, Officer John Higgs was called a "scab" by fellow officers and was assaulted by Officer John Minella. The DOC subsequently preferred disciplinary charges against Officer Minella and recommended that he be suspended without pay for thirty days. Following a hearing, an arbitrator upheld the charges, but ordered that the suspension be reduced to five days.

While these events were ongoing, Officers Cobb and Rouse were working their 11:00 p.m. to 7:00 a.m. shift on July 13–14, 1999 at the Penitentiary. Towards the end of their shifts, they received calls from Captain James Sullivan, the captain in charge of the 11:00 p.m. to 7:00 a.m. shift at the Penitentiary, asking if they wanted to volunteer for overtime. Each officer declined. A short time later, Captain Sullivan contacted Officers Cobb and Rouse again, as well as Officers Savino, Williams, Dorazio, Conway, Seckerson, and Vanderwerff (all of whom were also working the Penitentiary 11:00 p.m. to 7:00 a.m. shift) and informed each of them that they were being forced to work overtime. He then ordered the officers to report to the Jail at 7:00 a.m. on July 14, 1999.[2]

---

**2.** Prior to the time Captain Sullivan asked Officers Cobb and Rouse to work forced overtime, neither officer had mentioned that he was experiencing physical exhaustion or discomfort. Officer Rouse's testimony reveals that even after being asked to volunteer for overtime, he declined and responded that he "didn't really feel ... like working"—not that he was physically unable to work. Officer Rouse testified that when he was later ordered to work overtime, rather than referencing his physical exhaustion, as he did moments later in his special report, he said nothing. Officer Cobb's testimony reveals that he mentioned his back pain only after

Officer Conway responded by telling Captain Sullivan that he could not work the overtime shift because his wife was being discharged from the hospital that morning and was confined to bedrest. Captain Sullivan, who had prior knowledge of Officer Conway's family medical situation, told Officer Conway that he would release him, but instructed him to fill out a special report (a "special") describing his situation. He also told Officer Conway to bring in a doctor's note documenting his wife's status. Officer Vanderwerff told Captain Sullivan that he was unable to work the overtime shift at the Jail because his daughter was sick and no one was available to take care of her. After Officer Vanderwerff submitted a special to that effect, Captain Sullivan signed off on it and released him.

After receiving their instructions from Captain Sullivan, but before the start of the 7:00 a.m. to 3:00 p.m. Jail shift, Officers Cobb, Rouse, Savino, Williams, and Dorazio prepared specials in which they explained why they were physically unable to work the forced overtime shift. (Officer Seckerson did not prepare a special, as he had decided to accept his overtime assignment.) The specials read as follows:

Cobb's Special: Due to back pain and physical exhaustion, this officer can not perform his work duties. This officer has to see his doctor.

Rouse's Special: Due to being exhausted this officer cannot work another shift and would be unable to perform my [sic] duties.

Savino's Special: This writer is too physically tired to perform assigned duties in a safe and secure manner.

Dorazio's Special: This officer is unable to work another shift due to being ex-

hausted (physically) and be [sic] unable to perform my duties.

Williams' Special: This officer is unable to work another shift due to being exhausted physically and be [sic] unable to perform my duties.

The five officers then attempted to give their specials to Sergeant Alfred Booker, the desk sergeant in charge of the Penitentiary's 7:00 a.m. to 3:00 p.m. shift. Sergeant Booker, however, refused to accept them and instructed the five officers to report to the Jail, commenting that the situation was "a [P]en problem ... [not] a[J]ail problem." According to Sergeant Booker's sworn statement, between the time the five officers were ordered to work forced overtime and the time they attempted to submit their specials to him, he witnessed them in the Penitentiary Mess Hall with Officer Roger Smith, a COBA representative. Sometime after the five officers were told that they had to work forced overtime and before they submitted their specials, Officer Smith asked Captain Gerald Buch, the Penitentiary's administrative captain, if the officers forced to work overtime at the Jail could instead perform their forced shift at the Penitentiary. The captain rejected this request.

Complying with Sergeant Booker's order, Officers Cobb and Rouse proceeded to the Jail. While each drove separately, they walked into the Jail's tactical room (TAC room) together at a few minutes past 7:00 a.m. There, after they handed Sergeant Reilly their specials, Officers Cobb and Rouse were told they could leave. Before exiting the Jail, however, the two were called back into the TAC room. Upon returning, Officers Cobb and Rouse noticed that Officers Williams, Savino, Dorazio and Seckerson were also present. At this point, Officer Seckerson accepted his

Captain Sullivan initially asked him to volunteer for overtime.

order to work forced overtime and took his post in the Jail.

Next, Sergeant Reilly, Sergeant John Gleason, and several other superior officers at the Jail held a ten minute meeting behind closed doors in the Captain's office while the five officers, all of whom claimed to be too exhausted or in too much pain to work the forced overtime shift,[3] waited outside together. Sergeant Gleason then came out and told the five officers that they had to work and that if they refused, they would be required to present a doctor's note to their supervisor at their next regularly scheduled shift. The five officers then left the Jail. Officers Cobb and Rouse testified at trial that they went to their respective doctors and obtained notes documenting their physical conditions.

According to the testimony of Commissioner Pozzi, the DOC's policy in situations where an officer refuses to work overtime due to sickness or exhaustion is to send that officer to the emergency room if he needs immediate medical attention. If the officer is not seriously ill, the supervisor on duty could exercise his discretion and common sense to decide "whether to let [the officer] go and ... return back to work, with a doctor's note." Commissioner Pozzi's understanding of the DOC policy in effect on July 14, 1999 was that there was no option to force an officer to work overtime if that officer claimed to be sick and provided medical documentation.

*The Briefing*

At approximately 9:00 a.m. on July 14, 1999, Commissioner Pozzi, Deputy Commissioner R.L. Davis, Chief Miranda and Anthony Czarnecki, Special Assistant to the Commissioner, met with other DOC officers at the Commissioner's regularly-scheduled briefing. The attendees were informed that the five officers (including the plaintiffs) had been ordered to work forced overtime at the Jail, but that they had declined, citing physical exhaustion and discomfort. Chief Miranda expressed his opinion at the meeting that the officers' refusal to work forced overtime was the result of some sort of unlawful job action orchestrated by COBA or factions of COBA. In his view, "it was peculiar that five officers would get tired spontaneously, at the same time, and say that they couldn't work overtime." At trial, Chief Miranda testified that both the comments of COBA representative Christopher Smith and the five officers' spontaneous and simultaneous refusals to work overtime led the officials at the briefing to conclude that the incident was indicative of a job action. Based on this preliminary conclusion, Commissioner Pozzi immediately signed letters suspending the five officers with full pay and full benefits until further notice.

*The Investigation and Sergeant Cipollone's Report*

Shortly after the briefing, Sergeant Rose Cipollone of the DOC's Special Investigations Unit was ordered to conduct an investigation into the alleged job action. Her assignment required that she interview Officers Cobb, Rouse, Savino, Dorazio, and Williams. According to Sergeant Cipollone's final report, after the five officers submitted their specials, no one ordered them to work the forced overtime shift. Rather, Sergeant Gleason instructed them to obtain notes from their respective doctors and to present the notes to the shift commander at their next regularly scheduled shift. The report also reveals that each officer complied with Sergeant

---

**3.** As his special reflects, Officer Cobb claimed that in addition to being to physically exhausted, he was also experiencing back pain.

Gleason's instruction, and that interviews of the medical providers confirmed the validity of the notes they submitted.

Sergeant Cipollone's report also includes the statements of Sergeants Gleason, Reilly and Booker, as well as Captain Sullivan. Sergeant Booker's statement, as mentioned earlier, describes seeing the five officers consulting with COBA representative officer Roger Smith shortly after being ordered to work forced overtime and shortly before the officers attempted to submit their specials. Sergeant Reilly's affidavit, also mentioned earlier, describes the staffing shortage at the Jail on July 14, 1999 by comparing it with the more "typical" staffing observed on July 13, 1999. Sergeant Reilly's affidavit also references the comments of COBA representative officer Christopher Smith advising officers not to sign the overtime book on July 13, 1999, as well as the claims of certain officers that they were being harassed by their colleagues for their decisions to volunteer to work overtime on July 14, 1999.[4] Captain Sullivan's statement reveals that after receiving word that the Jail was in need of overtime volunteers from the Penitentiary, he asked Officers Cobb, Rouse, Savino, Dorazio and Williams if they wanted to volunteer. His statement goes on to note that, after the five officers declined without offering a reason, Captain Sullivan ordered them to report to the Jail for forced overtime for the July 14, 1999 7:00 a.m. to 3:00 p.m. shift.

*Czarnecki's Memorandum and Recommendation*

On August 3, 1999, Sergeant Cipollone completed her report and forwarded it to Special Assistant Anthony Czarnecki.

Czarnecki reviewed the report and its attachments and summarized it in a memorandum for Deputy Commissioner R.L. Davis, who was filling in for Commissioner Pozzi at the time. Czarnecki's memorandum states:

> After apparent consultation with COBA representative C.O. Roger Smith in the Penitentiary mess hall (observed by Sgt. Alfred Booker), [Officers Cobb, Rouse, Dorazio, Savino and Williams] reported to the Jail Division, and all claimed that they were either too tired to work an overtime shift or were experiencing some physical discomfort. All were ordered . . . to take their post assignment, but refused. They were then released from duty and ordered to produce a doctor's note (to cover their absence) and submit it to the Department the next duty day.

Czarnecki's memorandum concludes that "based on available information, it appears that all five corrections officers acted in concert to avoid working an overtime shift at the [J]ail." When asked by opposing counsel at trial what he meant by "apparently acted in concert," Czarnecki responded:

> Well, to me, it was highly suspicious that, during their regular shift from 11:00 p.m. to 7:00 a.m., none of these officers reported to their on-duty supervisors that they were tired, exhausted or experiencing any physical discomfort, number one. Number two, they seemed to simultaneously have these conditions only after they were directed to work an overtime shift. And number three, one of the medical notes, I believe submitted by Officer Cobb, indicates that his ap-

---

4. COBA representative Officer Christopher Smith should not be confused with COBA representative Officer Roger Smith. The former worked in the Jail and, as discussed earlier, instructed fellow officers not to volun-

teer for overtime on July 13, 1999. The latter worked in the Penitentiary and, according to Sergeant Booker, was seen conferring with the five suspended officers after they were given orders to work forced overtime.

pointment for medical treatment after the fact seemed to just confirm that he was there on a routine, weekly, pre-scheduled visit to his practitioner. All of those factors lead me to believe that this is highly suspicious, and that they did act in concert.

When asked at trial what he meant when he said that the officers "seemed to simultaneously have these conditions," Czarnecki testified that while Sergeant Gleason's statement did not use the term "simultaneously," Czarnecki believed that the five officers all submitted their specials at or about 7:00 a.m. His testimony on this point is consistent with the testimony of Officers Cobb and Rouse.

Czarnecki also testified that he reached his conclusion concerning the alleged concerted action, in part, based on the remarks of COBA representative officer Christopher Smith instructing officers not to volunteer for overtime. Czarnecki conceded that he had no information suggesting that Officers Cobb and Rouse were present at the Jail when Officer Smith made these remarks in the July 14, 1999 pre-shift meeting. He noted, however, that "word travels fast in the Department of Corrections" and that "there[ ] [was] every reason to believe that the staff at the [P]enitentiary division knew of that statement at a pre-shift meeting."

Czarnecki's memorandum to Deputy Commissioner Davis ultimately recommended that the DOC pursue formal disciplinary charges against the five officers for insubordination, conduct unbecoming an officer, and feigning illness or injury. He also recommended that the DOC change the officers' status to suspended *without* pay.

### The Charges

On August 5, 1999, Deputy Commissioner Davis signed a notice preferring charges against Officer Cobb, and on the following day, at the direction of the Commissioner's office, Chief Miranda signed an identical notice preferring charges against Officer Rouse. These notices informed the officers that the proposed penalty for their alleged conduct was termination from employment. Deputy Commissioner Davis testified that prior to preferring charges against Officers Cobb and Rouse, he discussed the decision with Commissioner Pozzi, who, he said, was already aware of the basis for the charges. Commissioner Pozzi testified that prior to directing that the DOC bring charges against Officers Cobb and Rouse, he had spoken with Deputy Commissioner Davis, Chief Miranda, and Special Assistant Czarnecki. Commissioner Pozzi also testified that the contents of Czarnecki's memorandum and Sergeant Cipollone's report had been conveyed to him through his discussions with Deputy Commissioner Davis. He conceded, however, that he had not seen the actual documents. He also conceded that at the time he preferred the charges against Officers Cobb and Rouse, he had received a letter from COBA's president asserting that there had been no job action and that five officers calling in sick on July 14, 1999 constituted a "temporary anomaly generated by the amount of forced overtime completely exhausting the corrections officer employee staff."

### The Arbitration

Pursuant to the terms of the collective bargaining agreement then in place, the charges against Officers Cobb, Rouse, Williams, Dorazio and Savino were submitted to arbitration. In August of 1999, the arbitrator held two days of hearings. Both sides were represented by counsel, and both sides submitted documentary and testimonial evidence. On September 16, 1999, the arbitrator issued a written opinion in which he concluded that "the DOC was unable to provide substantial and

credible evidence on the issues in dispute." The opinion continued: "While numerous elements of the requisite proofs were satisfied, the County was unable to directly link the five individuals to any misconduct." The arbitrator's opinion contained numerous factual findings and noted that the five officers had not disobeyed any orders; to the contrary, they had done exactly what was asked of them by preparing specials and presenting medical notes to document their inability to work. The opinion concluded:

> [I]t must be noted that the five [officers, including the plaintiffs,] were not charged with fabricating an illness or otherwise participating in a plan to avoid [forced overtime]. That all five were sick with corresponding symptoms may have been coincidence or happenstance; yet, without further proof that the officers committed an illegal act, they are entitled to the presumption of innocence.

The arbitrator ordered that the five officers be reinstated and made whole for the losses they incurred during their periods of suspension. Subsequently, the plaintiffs received all wages due.

Officers Cobb and Rouse later filed a petition in the Supreme Court, Westchester County, to confirm the arbitration award. The County responded by filing a cross-petition to vacate the award. On March 13, 2000, the state court issued a two-page decision and order holding that the arbitrator had not exceeded his authority and that the finding of "not guilty" was rational.

*Procedural History*

On May 1, 2000, Officers Cobb and Rouse filed a complaint in district court alleging that the defendants (1) retaliated against them based on their association with COBA, in violation of the First Amendment, (2) denied them equal protection of the laws under the Fourteenth Amendment by selectively prosecuting them, and (3) subjected them to malicious prosecution in violation of New York state law and the Fourteenth Amendment. Before filing an answer, the defendants moved to dismiss the complaint, arguing that the plaintiffs had failed to state a claim. The plaintiffs responded by cross-moving for partial summary judgment, maintaining that the defendants were precluded from relitigating the facts determined by the arbitrator and that, as a matter of law, those facts established liability.

At a hearing on the plaintiffs' motion, the district court stated that the findings of the arbitrator would "not be useful for offensive collateral estoppel." It added that the parties could revisit the collateral estoppel issue prior to trial and noted in a written endorsement that it was denying the plaintiffs' motion with leave to refile it as a motion *in limine* prior to trial. The district court also denied the defendants' motion to dismiss with leave to refile it as a motion for summary judgment after the conclusion of discovery.

The defendants subsequently answered the plaintiffs' first amended complaint and, following discovery, moved for summary judgment on all claims. On December 12, 2000, the court issued a written decision denying the defendants' motion. As to the "selective prosecution claim," the court ruled that disputed issues of fact prevented it from determining whether the defendants suspended Officers Cobb and Rouse "in order to punish [them] for constitutionally-protected activity related to COBA." *See Cobb v. Pozzi*, 00 CIV 2007(CLB), slip op. at 7 (S.D.N.Y. Dec. 12, 2000). As to the freedom of association claim, the court determined that, viewing the facts in the light most favorable to the plaintiffs, the plaintiffs could establish that the defendants issued the suspensions based on the

plaintiffs' membership in COBA. *See id.* at 8. The court also ruled that the individual defendants were not entitled to qualified immunity, explaining that the issue was fact-intensive and not appropriate for resolution at the summary judgment stage. *See id.* at 11.

The case was tried to a jury on November 13, 26, and 27, 2001. The plaintiffs never filed a motion *in limine* to have the arbitrator's findings accorded collateral estoppel effect. Rather, after the district court's deadline for the submission of jury instructions had passed, the plaintiffs submitted a proposed charge on the final day of testimony seeking to have the arbitrator's findings accorded preclusive effect. The defendants objected to this instruction, arguing, among other things, that the jury should not be bound by the arbitrator's findings concerning the defendants' belief that the plaintiffs had participated in an unlawful job action on July 14, 1999.

Adopting a view contrary to the one it had espoused earlier in the litigation, the district court accepted the plaintiffs' proposed charge and instructed the jury that it was to accept as binding numerous findings made by the arbitrator. It also instructed the jury that

> as a matter of law …, the activities COBA engaged in, which include collective bargaining or contract negotiations, … filing grievances on behalf of members, … seeking redress of grievances by way of arbitration and in the courts, and complaining to the public about the operation of the [DOC] are all protected by the First Amendment, and persons who belong to the union are protected from any adverse job action because of or motivated by such conduct.

After the district court finished instructing the jury, defense counsel took an additional exception to the First Amendment freedom of association instruction. Specifical-

ly, counsel objected to the portion of the charge referencing COBA's public criticism about the operation of the DOC and argued that there was no evidence in the trial record to support that assertion. Agreeing with the defendants' contention on this point, the district court immediately cured the instruction.

Following several hours of deliberation, the jury returned a verdict in favor of the plaintiffs. According to the verdict form, the jury concluded that each of the defendants had violated the First and Fourteenth Amendment rights of Officers Cobb and Rouse. In addition, the jury found that the defendants had not proved by a preponderance of the evidence that they would have disciplined Officers Cobb and Rouse even in absence of their COBA membership. The jury then awarded the plaintiffs $35,000 each in damages.

On December 11, 2001, the defendants moved for judgment as a matter of law, and, in the alternative, for a new trial. They argued, among other things, that the plaintiffs' freedom of association claim failed as a matter of law and that they had articulated a rational basis for their decision to treat the plaintiffs differently from similarly situated officers, like Officers Vanderwerff and Conway, who also had refused to take their overtime shifts. In their motion for a new trial, the defendants maintained that they suffered material prejudice as a result of the plaintiffs' failure to comply with the court's deadlines regarding the submission of proposed jury instructions because they were unaware, until the final day of testimony, that the plaintiffs were seeking to accord the arbitrator's findings collateral estoppel effect. Moreover, the defendants argued, regardless of the timing of the submission of the proposed charge, the application of collateral estoppel was inappropriate because different burdens of proof and presump-

tions were applied in the two proceedings. The defendants also claimed error in the court's instruction that the jury, in deciding the plaintiffs' equal protection claim, was free to consider the discipline imposed on Officer Minella, whom the DOC charged with assaulting a fellow officer.

In a written ruling issued on January 7, 2002, the district court denied both of the defendants' post-trial motions. *See Cobb v. Pozzi*, 00 CIV 2007(CLB), slip op. at 20 (S.D.N.Y. Jan 7, 2002). In the same ruling, the court granted the plaintiffs' application for costs and attorney's fees in the amount of $126,256.68. *See id.* Judgment entered on January 17, 2002, and this timely appeal followed.

## DISCUSSION

### I. *Judgment as a Matter of Law*

#### A. *Standard of Review*

 On appeal, the defendants argue, among other things, that the district court erred in failing to grant their Rule 50 motion for judgment as a matter of law. We review a district court's ruling on a Rule 50 motion *de novo*, and apply the same standard used by the district court below, *see Phillips v. Bowen*, 278 F.3d 103, 108 (2d Cir.2002). Provided the proper pre-verdict motion has been made and renewed, Rule 50(a) permits a district court to enter judgment as a matter of law against a party on an issue where " 'there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.' " *Nadel*, 321 F.3d at 271–72 (quoting Fed.R.Civ.P. 50(a)). "The standard for post-verdict judgment as a matter of law is the same as for summary judgment under Fed.R.Civ.P. 56." *Id.* at 272 (citation omitted). Accordingly,

> [a] district court must deny a motion for judgment as a matter of law unless, viewed in the light most favorable to the

nonmoving party, "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached."

*Id.* (quoting *Cruz v. Local Union No. Three of the Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1154–55 (2d Cir.1994)).

### B. *First Amendment Retaliation*

The plaintiffs allege in their complaint that the defendants violated their First Amendment right to freedom of association by subjecting them to disciplinary charges in retaliation for their membership in COBA. The defendants respond that to be protected under the First Amendment, the plaintiffs must show that their associational activity touches on a matter of public concern. The defendants maintain that because the plaintiffs have not made this showing, their freedom of association claim fails.

 Public employees do not surrender their First Amendment rights to comment on matters of public interest by virtue of their acceptance of government employment. *See Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Nevertheless, when playing the role of employer, the state possesses "greater leeway to control employees' speech that threatens to undermine its ability to perform its legitimate functions." *Lewis v. Cowen*, 165 F.3d 154, 161 (2d Cir.1999). Courts determine the extent to which the government may permissibly regulate the speech of its employees by balancing the interest of the employee, "as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391

U.S. at 568, 88 S.Ct. 1731. In *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), the Supreme Court observed that where the employee speech at issue does not touch on a matter of public concern, courts need not scrutinize the reason for the adverse employment action because "[w]hen employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *See id.* at 146, 103 S.Ct. 1684.

■ In view of these considerations, this Circuit has held that a plaintiff pursuing a claim for First Amendment retaliation must demonstrate that "(1) his speech addressed a matter of public concern, (2) he suffered an adverse employment action, and (3) a causal connection existed between the speech and the adverse employment action, so that it can be said that his speech was a motivating factor in the determination." *Mandell v. County of Suffolk*, 316 F.3d 368, 382 (2d Cir.2003) (citation and internal quotation marks omitted). Once a plaintiff satisfies these three factors, the government may avoid liability pursuant to either of two rationales. *See id.* The government may either (1) demonstrate by a preponderance of the evidence that it would have taken the same adverse action regardless of the protected speech, or (2) show that the plaintiff's expression was likely to disrupt the government's activities, and that the likely disruption was sufficient to outweigh the value of the plaintiff's First Amendment expression. *See id.* at 382–83 (citing *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir.1999) and *Locurto v. Safir*, 264 F.3d 154, 166 (2d Cir.2001)). The latter balancing rationale is commonly known as

the "*Pickering* balancing test" and represents a question of law for the court to decide. *See Locurto*, 264 F.3d at 166.

1. *Does* Connick's *Public Concern Inquiry Apply to Freedom of Association Claims as Well as Free Speech Claims?*

Here, the Court is presented with a First Amendment retaliation claim based on freedom of association rather than freedom of speech. Taking positions that mirror a split in the circuits, the parties disagree over whether *Connick*'s public concern requirement applies to such claims. *See Tang v. R.I. Dep't of Elderly Affairs*, 163 F.3d 7, 11 n. 4 (1st Cir.1998) (noting disagreement among circuits surrounding applicability of *Connick* to freedom of association claims, but declining to address issue). The defendants contend that a retaliation claim predicated on an employee's right to freedom of association requires that a plaintiff satisfy *Connick* by demonstrating that his associational activity touches on a matter of public concern. The plaintiffs respond that *Connick*'s threshold requirement is limited to retaliation claims premised on free speech, and that their associational activity, to be protected, need not touch on a matter of public concern.

■ We agree with the defendants and, joining the Fourth, Sixth and Seventh circuits, hold that a public employee bringing a First Amendment freedom of association claim must persuade a court that the associational conduct at issue touches on a matter of public concern. *See Klug v. Chicago Sch. Reform Bd. of Trs.*, 197 F.3d 853, 857 (7th Cir.1999) ("In this circuit, a public employee is protected from adverse employment consequences based on the exercise of the right to freedom of association only when the associational conduct relates to a matter of public concern.");

*Edwards v. City of Goldsboro*, 178 F.3d 231, 249–50 (4th Cir.1999) (applying public concern requirement to free association claim and observing that "[l]ogically, the limitations on a public employee's right to associate are 'closely analogous' to the limitations on his right to speak"); *Boals v. Gray*, 775 F.2d 686, 692 (6th Cir.1985) ("We perceive no logical reason for differentiating between speech and association in applying *Connick* to first amendment claims, and hold that it is so applicable."); *see also Martin v. City of Del City*, 179 F.3d 882, 888 (10th Cir.1999) ("This court has applied the[ ] principles from *Connick v. Myers* . . . in deciding First Amendment claims asserted by a public employee, who had claimed violations of her right to freedom of speech, freedom of association, and to petition for redress of grievances."). *But see Boddie v. City of Columbus*, 989 F.2d 745, 747 (5th Cir.1993) (holding that a plaintiff asserting a First Amendment freedom of association claim need not show that his or her associational activity touched upon a matter of public concern); *Hatcher v. Bd. of Pub. Educ. & Orphanage*, 809 F.2d 1546, 1558 (11th Cir.1987) (holding that a principal who based her freedom of association claim on her connection with protesting parents was not required to demonstrate that her association related to a matter of public concern).

We reach this conclusion, in part, based on our reading of *Connick* and the decisions on which that opinion relies. The plaintiff in *Connick*, an assistant prosecutor, was dismissed for her part in what superiors called a mini-insurrection in the district attorney's office. *See Connick*, 461 U.S. at 140–41, 103 S.Ct. 1684. Irked by the defendant's decision to transfer her to a different office, the plaintiff distributed a questionnaire soliciting her co-workers' views on issues such as the need for a grievance committee, office transfer policy and whether or not co-workers felt pressure to work on political campaigns. *See id.* at 141, 103 S.Ct. 1684. The defendant subsequently dismissed the plaintiff, citing her refusal to accept the transfer. *See id.* Following her dismissal, the plaintiff filed suit under 42 U.S.C. § 1983, contending that she had been terminated in retaliation for exercising her protected right to free speech. *See id.*

The district court found in the plaintiff's favor, reinstated her, and awarded her back pay and attorney's fees. *See id.* at 141–42, 103 S.Ct. 1684. The Fifth Circuit affirmed the district court's ruling, and the Supreme Court reversed. *See id.* at 141, 154, 103 S.Ct. 1684. In doing so, the Court detailed the historical development of the rights of government employees, placing emphasis on a line of McCarthy-era decisions in which it had granted relief to public employees who suffered, or stood to suffer, adverse employment action in retaliation for their refusal to take loyalty oaths and reveal their various associations. *See id.* at 144, 103 S.Ct. 1684 (citing *Wieman v. Updegraff*, 344 U.S. 183, 186, 191, 73 S.Ct. 215, 97 L.Ed. 216 (1952) (finding unconstitutional an Oklahoma law requiring public employees to take a loyalty oath, which required the employees to affirm, among other things, that they had not been "affiliated" with any subversive organizations); *Cafeteria Workers v. McElroy*, 367 U.S. 886, 898, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961) (recognizing that a government employer could not, within the confines of the Constitution, exclude an individual based on her previous membership in a certain political party or religious group); *Shelton v. Tucker*, 364 U.S. 479, 485–86, 490, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960) (striking down an Arkansas law requiring teachers to disclose organizations with which they were affiliated; "[T]o compel a teacher to disclose his every associational tie is to impair that teacher's right

of free association, a right closely allied to freedom of speech [which] lies at the foundation of a free society."); *Keyishian v. Bd. of Regents,* 385 U.S. 589, 609–10, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) (invalidating a New York law that barred employment of teachers on the basis of their association with "subversive organizations")).

Beginning with *Pickering v. Board of Education,* the *Connick* Court traced its decisions safeguarding employee speech that related to matters of public concern, noting that such speech constituted the "essence of self-government." *Id.* at 145–46, 103 S.Ct. 1684 (internal quotation marks and citation omitted). Discussing the public concern requirement, the Court referenced employee expression, not just employee speech, and explained that "[w]hen employee *expression* cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Id.* at 146, 103 S.Ct. 1684 (emphasis added).

Turning to the questionnaire circulated by the plaintiff in the case before it, the Court held that, with one exception, the questions did "not fall under the rubric of matters of 'public concern.'" *Id.* at 148, 103 S.Ct. 1684. Rather, they were reflective of one employee's dissatisfaction with her working conditions and the status quo. *See id.* In reaching this conclusion, the Court warned that "[t]o presume that all matters which transpire within a government office are of public concern would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case." *Id.* at 149, 103 S.Ct. 1684.

Our reading of *Connick* and the cases supporting it suggests that while it was the plaintiff's *speech* that was under examination, the Court's concern over the proper balance of the efficient functioning of the government and the First Amendment rights of public employees extended more generally to all forms of First Amendment *expression,* including associational activity. This broader concern is reinforced by the Court's observation that the issue in each of the cases on which it relied was whether public employees "could be prevented or 'chilled' by the fear of discharge from *joining political parties and other associations* that ... public officials might find 'subversive.'" *See id.* at 145, 103 S.Ct. 1684 (emphasis added). We see nothing in *Connick* that would limit the public concern requirement to First Amendment claims based on free speech, as opposed to claims premised on other forms of First Amendment expression, and we are not alone in this observation. *See Griffin v. Thomas,* 929 F.2d 1210, 1214 (7th Cir.1991) (observing that there was no logical basis for distinguishing between speech and association for the purposes of applying *Connick* to First Amendment retaliation claims); *Monks v. Marlinga,* 923 F.2d 423, 425 (6th Cir.1991) (rejecting plaintiffs' attempts to distinguish speech and association in applying *Connick* to First Amendment actions, including those premised on alleged retaliation for union activity); *Boals,* 775 F.2d at 692 ("We perceive no logical reason for differentiating between speech and association in applying *Connick* to first amendment claims."); *Broderick v. Roache,* 767 F.Supp. 20, 25 n. 9 (D.Mass.1991) (observing that "nothing in [*Connick*] ... suggests that the Court intended to limit its holding to the expressive aspect of the first amendment freedoms").

Our conclusion that *Connick*'s public concern requirement applies to freedom of association claims also derives support from the Supreme Court's teaching that there should exist no hierarchy among First Amendment rights. *See McDonald v. Smith*, 472 U.S. 479, 482, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985). In *McDonald*, the Supreme Court addressed a libel claim brought by a prospective nominee for U.S. Attorney against a citizen who had submitted two letters to the President, both of which were critical of the nominee. *See id.* at 480–81, 105 S.Ct. 2787. The defendant contended that because he sent his letters directly to the President and because the letters concerned a matter of public importance, the First Amendment's Petition Clause provided him with an absolute immunity from damages, as opposed to the qualified privilege his letters would have received under the standard established in *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). *See McDonald*, 472 U.S. at 486, 105 S.Ct. 2787 (Brennan, J., concurring). Declining the defendant's invitation to elevate the right to petition the government to "special First Amendment status," *see id.* at 485, 105 S.Ct. 2787, the Court acknowledged that the right to petition was "cut from the same cloth as the other guarantees of that Amendment," *id.* at 482, 105 S.Ct. 2787, and that it "was inspired by the same ideals of liberty and democracy that gave us the freedoms to speak, publish, and assemble," *id.* at 485, 105 S.Ct. 2787. The Court concluded that the rights protected by the First Amendment are "inseparable" and that no "sound basis" existed for according greater protection to one right over another. *See id. See also id.* at 489, 105 S.Ct. 2787 (Brennan, J., concurring) ("The Framers envisioned the rights of speech, press, assembly, and petitioning as interrelated components of the public's exercise of its sovereign authority.").

■ Because the right of association is derivative of the First Amendment rights of free speech and peaceful assembly, *see, e.g., Healy v. James*, 408 U.S. 169, 181, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972), it would be anomalous to exempt it from *Connick*'s public concern requirement and thereby accord it an elevated status among First Amendment freedoms. We have relied on *McDonald*'s reasoning in concluding that retaliation claims premised on the First Amendment right to petition are subject to *Connick*'s public concern requirement. *See White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1059 (2d Cir.1993) (reversing judgment for plaintiffs and noting that, under *McDonald*, a First Amendment right to petition claim—"an assurance of a particular freedom of expression"—was subject to the public concern requirement). A majority of circuits addressing this same issue have followed suit. *See, e.g., Martin*, 179 F.3d at 888 (citing *McDonald* and concluding that an employee bringing a retaliation claim based on the First Amendment right to petition must show that the petition touched on a matter of public concern); *Grigley v. City of Atlanta*, 136 F.3d 752, 755 (11th Cir.1998) (quoting *McDonald* and holding that "a public employee's claim of retaliation in violation of the First Amendment right to petition is subject to the public concern requirement"); *Rendish v. City of Tacoma*, 123 F.3d 1216, 1220–21 (9th Cir.1997) (citing *McDonald* and holding that "in order to be constitutionally protected under either the Speech Clause or the Petition Clause, a public employee's actions must involve a matter of public concern"); *Valot v. Southeast Local Sch. Dist. Bd. of Educ.*, 107 F.3d 1220, 1226 (6th Cir.1997) ("[T]he right to petition is limited to mat-

ters of public concern."); *Belk v. Town of Minocqua*, 858 F.2d 1258, 1262 (7th Cir. 1988) (advising against stratification of First Amendment freedoms, per *Mc-Donald*, and requiring the plaintiff to show that her petition touched on a matter of public concern); *Day v. South Park Indep. Sch. Dist.*, 768 F.2d 696, 701, 703 (5th Cir.1985) (citing *McDonald* and rejecting plaintiff's argument that public concern requirement did not apply to a right to petition retaliation claim because such an argument assumed that "when a government employer deals with its own employees, the protection afforded by the petition clause is entirely discrete from and broader than the shield afforded by the other clauses of the first amendment, a premise that is undermined by the Supreme Court's repeated references to these clauses as being overlapping").[5] To accept the plaintiffs' contention that their retaliation claim is exempt from *Connick*'s public concern requirement would be to elevate the *implicit* First Amendment right of freedom of association, *see Healy*, 408 U.S. at 181, 92 S.Ct. 2338, over other *explicit* First Amendment rights such as freedom of speech and the right to petition. We are unwilling to establish such a rule. *See McDonald*, 472 U.S. at 482, 105 S.Ct. 2787.

Like the Fifth and Eleventh circuits, the plaintiffs rely on the Supreme Court's decision in *Smith v. Ark. State Highway Employees, Local 1315*, 441 U.S. 463, 99 S.Ct. 1826, 60 L.Ed.2d 360 (1979) (per curiam) to support their position that *Connick*'s public concern requirement is inap-

plicable to freedom of association claims. *See Boddie*, 989 F.2d at 748; *Hatcher*, 809 F.2d at 1558. In *Smith*, the Supreme Court acknowledged that a "public employee surely can associate and speak freely and petition openly, and ... is protected by the First Amendment from retaliation for doing so." *Id.* at 465, 99 S.Ct. 1826 (citing *Pickering*, 391 U.S. at 574–75, 88 S.Ct. 1731; *Shelton*, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231). The plaintiffs' argument is unpersuasive for two reasons. First, the plaintiffs in *Smith*, public employees and their union, did not allege First Amendment retaliation. *See id.* They claimed instead that a procedure requiring employees to submit grievances directly to their public employer rather than indirectly through their union violated their First Amendment rights. *See id.* at 463, 99 S.Ct. 1826. The Court's holding in *Smith*—that the First Amendment does not require a government employer to recognize or respond to a union—has no bearing on the issues raised in this case. *See id.* at 465, 99 S.Ct. 1826. Second, in light of the Supreme Court's more recent decision in *Connick*, we do not believe that subjecting freedom of association claims to the public concern requirement is inconsistent with *Smith*'s observation that the First Amendment protects public employees who "associate[,] speak freely and petition openly." *See id.* Distinguishing *Smith* in a case raising the same issue presented here, *i.e.*, whether the public concern requirement applies to freedom of association claims, the Sixth Circuit recog-

---

5. In arguing that the public concern requirement does not apply to First Amendment freedom of association actions, Officers Cobb and Rouse rely heavily on the Fifth Circuit's decision in *Boddie*, 989 F.2d at 747, and the Eleventh Circuit's holding in *Hatcher*, 809 F.2d at 1558. Neither *Boddie* nor *Hatcher* addresses the Supreme Court's instruction in

*McDonald*. Interestingly, however, both circuits, relying on *McDonald*, have held that a public employee's claim of retaliation in violation of the First Amendment right to petition is subject to the public concern requirement. *See Grigley*, 136 F.3d at 755; *Day*, 768 F.2d at 701.

nized that the Supreme Court's later decision in *Connick*

> did not hold that speech by a public employee not on a matter of public interest was "totally beyond the protection of the First Amendment," but merely that such speech did not give rise to a cause of action in federal court "to, review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior."

*Boals*, 775 F.2d at 692 (quoting *Connick*, 461 U.S. at 147, 103 S.Ct. 1684, and concluding that the public concern requirement applied to the plaintiff's freedom of association claim). In other words, *Connick* did not hold that a public employee completely relinquishes his First Amendment rights in taking public employment, it merely defined a category of public employee speech—speech on matters of private concern—that could not provide a proper basis for a federal cause of action for an adverse employment action. *See Griffin*, 929 F.2d at 1213; *Connick*, 461 U.S. at 147, 103 S.Ct. 1684 ("We hold *only* that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, . . . a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." (emphasis added)). Similarly, our holding today requiring Officers Cobb and Rouse to show that their associational activity touches on matters of public concern does not mean that associational activity that touches only on matters of private concern is "totally beyond" the First Amendment's protection. Rather, it simply recognizes, as *Connick* did in the context of free speech, that *some* associational activity—that activity touching only on matters of private concern—cannot support a claim

for First Amendment retaliation in the employment context.

In sum, *Connick*'s reliance on freedom of association cases and the Supreme Court's warning against the stratification of First Amendment freedoms convince us that a public employee bringing a freedom of association claim must demonstrate that the association or associational activity at issue touches on a matter of public concern.

2. *Assuming That Union Membership Touches on a Matter of Public Concern, Was the Evidence Sufficient to Prove That Plaintiffs' Membership in COBA Was a Motivating Factor for the Defendants to Discipline Them?*

■ On appeal, the plaintiffs contend that their "membership in COBA is, in and of itself, protected by the First Amendment." We have not had occasion to decide whether union membership alone touches on a matter of public concern and therefore provides a proper basis for a First Amendment retaliation claim. In *Clue v. Johnson*, 179 F.3d 57 (2d Cir.1999), we held that union *activities* such as handing out leaflets and distributing a union newsletter satisfied *Connick*'s public concern requirement. *See id.* at 59, 61. Here, however, the plaintiffs distance themselves from any union *activity*. Instead, their brief repeatedly describes their retaliation claim as one of "pure free association" premised solely on the fact of their membership in COBA. We need not decide today whether such membership, by itself, touches on a matter of public concern. Assuming, without deciding, that it does, we conclude that there was not enough evidence from which a reasonable jury could infer that this allegedly protected expression was a substantial or motivating factor in the defendants' decision to discipline the plaintiffs.

 A plaintiff can establish the causal connection between protected expression and an adverse employment determination indirectly "by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus." *Morris*, 196 F.3d at 110. We generally are reluctant to reverse a district court's denial of a motion for judgment as a matter of law in cases where questions concerning the employer's state of mind predominate the inquiry into whether an employee's expression was a substantial or motivating factor in the adverse employment decision. *Cf. Piesco v. City of New York*, 933 F.2d 1149, 1155 (2d Cir.1991), *abrogation on other grounds recognized by Jeffries v. Harleston*, 52 F.3d 9, 12 (2d Cir.1995). Nonetheless, we have held that a plaintiff may not rely on conclusory assertions of retaliatory motive to satisfy the causal link. *See Morris*, 196 F.3d at 111. Instead, he must produce "some tangible proof to demonstrate that [his] version of what occurred was not imaginary." *Id.*

In determining whether the causation requirement was satisfied in this case, we must bear in mind that Officers Cobb and Rouse do not contend that their conduct in refusing to work overtime represents the protected expression that prompted their discipline; they make clear that their respective refusals to work overtime were in no way connected to, or inspired by, COBA. Rather, as noted above, the plaintiffs maintain that their COBA membership alone constitutes the protected activity on which their retaliation claim is based. The evidence presented at trial, however, was not sufficient to permit a reasonable jury to conclude that the plaintiffs' membership in COBA was a motivating factor in the defendants' decision to discipline them. Rather, it strongly suggested that the defendants acted because they believed that the plaintiffs were engaged in an unlawful job action.

Numerous witnesses testified that the facts surrounding the events of July 14, 1999 led them to conclude that a job action was in the works. For instance, Chief Miranda testified that in light of COBA representative Christopher Smith's advice to his colleagues that they not sign up for overtime and in view of the unusually small number of officers that volunteered for the July 14, 1999 7:00 a.m. to 3:00 p.m. shift at the Jail, he felt that five officers' refusals to work overtime were indicative of a job action. In his words, it was "peculiar that five officers would get tired spontaneously, at the same time, and say they couldn't work overtime." Special Assistant Czarnecki provided similar testimony. Explaining the basis for his conclusion that the five officers had acted in concert to avoid working an overtime shift at the Jail, he testified:

> [I]t was highly suspicious that, during their regular shift from 11:00 p.m. to 7:00 a.m., none of [the five officers, including the plaintiffs,] reported to their on-duty supervisors that they were tired, exhausted or experiencing any physical discomfort, number one. Number two, they seemed to simultaneously have these conditions only after they were directed to work an overtime shift. And number three, one of the medical notes, I believe submitted by Officer Cobb, indicates that his appointment for medical treatment after the fact seemed to just confirm that he was there on a routine, weekly, prescheduled visit to his practitioner. All of those factors lead me to believe that this is highly suspicious, and that they did act in concert.

County Executive Spano's testimony was consistent with that of Chief Miranda and Special Assistant Czarnecki. He testified that it was "extremely strange" that

five officers would simultaneously become ill after being asked to work overtime. These circumstances led Spano to believe that the five officers were feigning illness because they did not want to work an overtime shift at the jail. Deputy Commissioner R.L. Davis and Commissioner Pozzi reached similar conclusions based on these same facts.

The defendants' belief on this point ultimately may have been mistaken, but such a mistake does not transform the basis of the defendants' decision from a genuine belief that certain officers engaged in an unlawful job action into an anti-union animus. The record supports no such inference, especially in light of (1) the defendants' treatment of other COBA members who refused to work overtime on the same day and (2) the passage of time between when the defendants first became aware of the plaintiffs' COBA membership and when the defendants disciplined the plaintiffs.

First, in addition to "forcing" Officers Cobb, Rouse, Dorazio, Savino and Williams, Captain Sullivan also ordered Officers Conway and Vanderwerff to work the 7:00 a.m. to 3:00 p.m. overtime shift at the Jail on July 14, 1999. Officers Conway and Vanderwerff—both COBA members—explained that they could not work overtime because they had to go home to take care of ailing family members. After filling out specials detailing their respective situations, these two officers were released without further incident; neither was disciplined for refusing to take the forced overtime shift. The treatment of Officers Vanderwerff and Conway, both of whom were COBA members and both of whom refused to work forced overtime at the Jail on July 14, 1999, provides further support for the conclusion that the defendants' decision to discipline the plaintiffs was not based on the plaintiffs' membership in COBA.

Second, both plaintiffs testified that all corrections officers are members of COBA. The plaintiffs had been corrections officers for over ten years, and there is no claim that they only recently joined COBA. The plaintiffs' discipline occurred only after their participation in what the defendants believed was an unlawful job action. Thus, it is "highly implausible" that the plaintiffs' association with COBA was a motivating factor in the decision to initiate disciplinary action. *Cf. Melzer v. Bd. of Educ.*, 336 F.3d 185, 199 (2d Cir.2003) (noting that defendant's knowledge of plaintiff's membership in North American Man/Boy Love Association years prior to plaintiff's dismissal made it "highly implausible" that dismissal was motivated by NAMBLA membership); *see also Strahan v. Kirkland*, 287 F.3d 821, 826 (9th Cir.2002) (holding that sergeant had not shown that his association with motorcycle club was a motivating factor for employer's decision to demote him where, among other things, employer knew of sergeant's association "long before" disciplinary action was taken).

### C. *Equal Protection Claim*

The defendants also argue that they are entitled to judgment as a matter of law on the plaintiffs' equal protection claim. In this case, the plaintiffs advance two related, yet different, equal protection arguments. In their amended complaint and in their opposition to various pretrial and post-trial motions by the defendants, the plaintiffs maintained that the defendants denied them equal protection of the laws by subjecting them to "selective prosecution." At trial and on appeal, Officers Cobb and Rouse appear also to assert a "class of one" equal protection claim based on the Supreme Court's recent decision in

*Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000). *See African Trade & Info. Ctr. v. Abromaitis,* 294 F.3d 355, 363–64 (2d Cir. 2002) (distinguishing between selective prosecution equal protection claim and *Olech*-based equal protection claim).

▮ As we recently reaffirmed, "[t]he Equal Protection Clause requires·that the government treat all similarly situated people alike." *Harlen Assocs. v. Inc. Vill. of Mineola,* 273 F.3d 494, 499 (2d Cir.2001) (citing *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)). To succeed in an action alleging selective prosecution, plaintiffs in this Circuit

> have been required to show both (1) that they were treated differently from other similarly situated individuals, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

*Harlen Assocs.,* 273 F.3d at 499 (internal citation and quotation marks omitted).

▮ Describing their "selective prosecution" claim, the plaintiffs contend in their appellate brief that they "were treated differently from others similarly situated and that the motivation for that disparate treatment was a malicious intent to injure the plaintiffs and to punish them for the exercise of their constitutional rights— to associate with [COBA]." Due to the manner in which they have cast their contentions throughout this action, the plaintiffs' selective prosecution and retaliation claims "coalesce." *African·Trade & Info. Ctr.,* 294 F.3d at 363. The plaintiffs' selective prosecution claim requires proof that the defendants treated them differently

because of their membership in COBA. Our holding on the First Amendment retaliation claim that the evidence in this case was insufficient, as a matter of law, to show that the defendants disciplined the plaintiffs based on their membership in COBA requires that we direct entry· of judgment for the defendants on the plaintiffs' selective prosecution claim as well. *See Vukadinovich v. Bartels,* 853 F.2d 1387, 1392 (7th Cir.1988).

▮ Unlike their selective prosecution claim, the plaintiffs' *Olech*-based equal protection claim is not dependent on their ability to prove that they were disciplined for an impermissible reason, *i.e.,* for their COBA membership. Rather, under *Olech,* the plaintiffs can recover if they can show that they were treated differently from similarly situated officers, such as Officers Conway and Vanderwerff, and that there was "no rational basis for the difference in treatment." *Olech,* 528 U.S. at 564, 120 S.Ct. 1073. Clearly, the evidence that the defendants.disciplined the plaintiffs based on.a belief that the plaintiffs were engaged in an unlawful job action makes the task of showing irrational treatment considerably more difficult; however, it does not foreclose the plaintiff's pursuit of such a claim under *Olech.* A jury could find that the defendants' subjective belief was unwarranted and that such an unwarranted belief resulted in the irrational treatment of the plaintiffs. Accordingly, we agree with the plaintiffs that the evidence adduced at trial was sufficient to withstand a motion for judgment as a matter of law on their *Olech*-based equal protection claim. For the reasons explained below, however, we believe that the district court's jury instruction requires that we remand for a new trial.[6]

---

**6.** The district court's jury instruction covered

both the *Olech*-based equal protection claim

■ Before we proceed to address the problems associated with the jury instructions, we first respond to the defendants' contention that they are entitled to qualified immunity. The defendants argue that the equal protection principles articulated in *Olech* were not clearly established law at the time of the alleged unconstitutional conduct at issue in this appeal and that they should therefore be shielded from that claim on the grounds of qualified immunity. They also contend that they are entitled to qualified immunity because they treated the defendants in a manner that was objectively reasonable.

We reject each of these arguments. First, the law pertaining to "class of one" equal protection claims was clearly established in 1999 (*i.e.* when the events at issue here took place). As we recently noted in *African Trade & Info. Ctr.*, the Supreme Court did not depart from well settled equal protection principles in *Olech. See* 294 F.3d at 362–63. Rather, the *Olech* Court merely *"reaffirmed"* that "equal protection claims can be brought by a 'class of one.'" *Id.* at 362 (emphasis added). As the Supreme Court underscored in *Olech*, the Court has long "recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Olech*, 528 U.S. at 564, 120 S.Ct. 1073 (citing cases stretching back to 1923).

The defendants nonetheless contend that the specific contours of a "class of one" equal protection claim were modified when the Supreme Court decided *Olech* in 2000 such that the standards for this type of claim could not have been "clearly established" in 1999. However, in *African Trade & Info. Ctr.*, where the plaintiffs brought a "class of one" equal protection claim premised on conduct that had taken place *in 1998*, we explained that "[i]f plaintiffs had alleged that [the defendant's conduct] . . . was wholly arbitrary, or irrational, they would have alleged a violation of a *clearly established* constitutional right." *Id.* at 358, 363 (emphasis added). Because that is the type of "class of one" equal protection claim with which the district court charged the jury at the close of the trial, there can be little doubt in the wake of our decision in *African Trade & Info. Ctr.* that the relevant standards for the particular *Olech*-based equal protection claim advanced at trial were clearly established even with respect to conduct that pre-dated *Olech.*

■ The defendants also argue that they are entitled to qualified immunity as a matter of law because they treated the plaintiffs in an "objectively reasonable" manner. Under the circumstances, however, this is a question for the jury. We have already determined that there was enough evidence for the jury, rather than the district court, to decide whether the defendants treated the plaintiffs different-

as well as the selective prosecution theory. The verdict form, however, did not require the jury to specify the theory on which it found the plaintiffs prevailed. Instead, it called for the jury to answer the following general question as to each defendant: "Has [each plaintiff] established by a preponderance of the evidence that [each defendant] violated his rights to equal protection as guaranteed by the Fourteenth Amendment of the United States Constitution?" The defendants

did not object to the equal protection portion of the verdict form. *See O'Neill v. Krzeminski*, 839 F.2d 9, 12 (2d Cir.1988) ("Normally, when two claims have been submitted to a jury and one of them should not have been submitted, a general verdict in favor of the claimant cannot stand, since it is not possible, in the absence of special interrogatories, to know upon which claim the jury rested its decision.").

ly from similarly situated officers and had a rational basis for doing so. The issue of rational treatment is not sufficiently different from the issue of whether the defendants acted in an "objectively reasonable" manner so as to lead us to resolve the latter issue as a matter of law where we have concluded in the face of disputed issues of fact that the jury must resolve the former issue. *See Pathways Psychosocial v. Town of Leonardtown,* 133 F.Supp.2d 772, 793 (D.Md.2001) (concluding that the defendants were not entitled to qualified immunity on the grounds that they acted in an objectively reasonable manner where a jury could find that their actions were irrational). *Cf. Stefanoff v. Hays County, Texas,* 154 F.3d 523, 526 (5th Cir.1998) (finding that a policy was not objectively reasonable after determining that the policy was not rational for equal protection purposes); *cf. also Tesfu v. Ashcroft,* 322 F.3d 477, 481 (7th Cir. 2003) (noting that, in the context of asylum determinations, a fear of persecution must be "objectively reasonable" and therefore may not be "irrational"); *Perinpanathan v. I.N.S.,* 310 F.3d 594, 597–98 (8th Cir. 2002) (same). Indeed, it is difficult for us to see how conduct that is irrational (if so found by a jury) could nevertheless be objectively reasonable. Given these circumstances, the facts pertaining to whether the defendants acted in an objectively reasonable fashion, like those pertaining to the issue of whether they treated the plaintiffs differently from similarly situated officers for rational reasons, must be evaluated by a jury rather than by a court as a matter of law.

## II. *Erroneous Jury Instruction*

### A. *Standard of Review*

 The defendants contend that one of the district court's jury instructions

improperly accorded collateral estoppel effect to certain findings made by the arbitrator, and that they are entitled to a new trial as a result. Where a party challenges a jury instruction in its motion for a new trial, we review that instruction *de novo. See Phillips,* 278 F.3d at 110; *Gordon v. New York City Bd. of Educ.,* 232 F.3d 111, 115 (2d Cir.2000). Where the court's instruction misleads the jury as to the correct legal standard or where it fails to adequately inform the jury on the law, it will be deemed erroneous. *See Gordon,* 232 F.3d at 116. An erroneous jury instruction mandates a new trial unless the error is harmless. *See id.*

### B. *The District Court's Jury Instruction*

On the last day of testimony, the plaintiffs filed a proposed jury charge requesting that the court instruct the jury that certain findings made by the arbitrator were binding on it as matter of law. Although the district court had previously denied the plaintiffs' request that these findings be accorded preclusive effect,[7] it accepted the proposed charge and instructed the jury as follows:

> [T]he following facts have been established in the arbitration and you must accept them as binding upon you in your deliberations: ... A, the plaintiffs did not disobey any orders of Sergeant Gleason but did exactly what they were told to do. They prepared special reports and subsequently presented medical notes as ordered. B, Sergeant Gleason had no reason to doubt what plaintiffs told him about their medical conditions and he sent them home. C, if the supervisors believed that the

---

7. The district court denied the plaintiffs' request "with leave to refile as an *in limine* motion prior to trial." The record does not reflect that the plaintiffs filed such a motion.

plaintiffs were feigning illness, pursuant to the medical policy, they could have sent plaintiffs to the Emergency Room; they did not do so. D, there was no evidence that the plaintiffs organized, took part in, or were aware of any job action on July 14, 1999, by other people. E, whether or not Corrections Officer [Christopher] Smith made any suggestions about not volunteering to work overtime, the plaintiffs were not present at the facility when this statement was made. F, there was no evidence to link the plaintiffs with any such statements even if made.... G, there was no probable cause to suspend the plaintiffs without pay.

The defendants contend that this was error.

## C. Was the Application of Collateral Estoppel Appropriate?

■■■■ Under New York law, collateral estoppel "precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party or those in privity, whether or not the tribunals or causes of action are the same." *Burgos v. Hopkins,* 14 F.3d 787, 792 (2d Cir.1994) (quoting *Ryan v. New York Tel. Co.,* 62 N.Y.2d 494, 500, 478 N.Y.S.2d 823, 826, 467 N.E.2d 487, 490 (1984)). New York courts will invoke the doctrine of collateral estoppel "if the issue in the second action is identical to an issue which was raised, necessarily decided and material in the first action, and the [party against whom preclusion is sought] had a full and fair opportunity to litigate the issue in the earlier action." *Parker v. Blauvelt Volunteer Fire Co.,* 93 N.Y.2d 343, 349, 690 N.Y.S.2d 478, 482, 712 N.E.2d 647 (1999) (citation omitted). Also, the issue raised in the first action must be "decisive" of the second action. *See Curry*

*v. City of Syracuse,* 316 F.3d 324, 331 (2d Cir.2003) (citation omitted). The burden of showing that an issue raised in a subsequent proceeding "is identical to one that was raised and necessarily decided in the prior action rests squarely on the party moving for preclusion." *Sullivan v. Gagnier,* 225 F.3d 161, 166 (2d Cir.2000).

■■■ Courts and commentators alike have recognized that a shift or change in the burden of proof can render the issues in two different proceedings non-identical, and thereby make collateral estoppel inappropriate. *See Clark v. Bear Stearns & Co.,* 966 F.2d 1318, 1322 (9th Cir.1992) ("[C]ollateral estoppel does not preclude claims that have a different burden of proof than previously decided claims[.]"); *Guenther v. Holmgreen,* 738 F.2d 879, 888 (7th Cir.1984) ("It is, of course, well established that issue preclusion may be defeated by shifts in the burden of persuasion or by changes in the degree of persuasion required." (citation omitted)); 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4422 at 592 (2002) ("Failure of one party to carry the burden of persuasion on an issue should not establish the issue in favor of an adversary who otherwise would have the burden of persuasion on that issue in later litigation."); 18 James Wm. Moore *et al., Moore's Federal Practice,* § 132.02[4][e] (3d ed.1997) (noting that "issue preclusion does not apply when the party seeking to benefit from preclusion has a significantly heavier burden in the subsequent action than in the prior action"); *Restatement (Second) of Judgments* § 28(4) (1982) ("[R]elitigation of the issue in a subsequent action between the parties is not precluded ... [where] [t]he party against whom preclusion is sought had a significantly heavier burden of persuasion with respect to the issue in the initial action than in the subsequent action; ... or the adversary

has a significantly heavier burden than he had in the first action.").

A party's success in an earlier proceeding where it faced a lower burden of proof does not mean that, against a higher burden of proof in a subsequent proceeding, that party would achieve the same result. "To apply issue preclusion [when the burden of proof is heavier in the second litigation] would be to hold, in effect, that the losing party in the first action would also have lost had a significantly different burden [been] imposed." *Restatement (Second) of Judgments* § 28, cmt. f (1982). "Since the process by which the issue was adjudicated cannot be reconstructed on the basis of a new and different burden, preclusive effect is properly denied." *Id.*

We have recognized that a difference in the burdens of proof in two proceedings can make the application of collateral estoppel improper. *See, e.g., Purdy v. Zeldes,* 337 F.3d 253, 259 (2d Cir.2003) ("[A] litigant's failure to meet a higher burden of proof on an issue in a prior proceeding does not bar him from raising the same issue in a subsequent proceeding in which his burden will be lighter."). For instance, in *Neaderland v. Commissioner,* 424 F.2d 639 (2d Cir.1970), we declined to apply collateral estoppel where a defendant was acquitted on criminal charges of tax fraud and sought to accord that acquittal preclusive effect in a subsequent action in which the defendant faced civil charges of tax fraud. *See id.* at 642. In refusing to grant the defendant the benefit of the earlier finding of acquittal, we acknowledged that even where the issues and facts in both cases are identical, collateral estoppel is inapplicable "unless the matter raised in the second case involves substantially the same bundle of legal principles that contributed to the rendering of the first judgment." *Id.* (internal quotation marks and citation omitted). We conclud-ed that the "burden of proof factor alone is sufficient to demonstrate that the 'bundle of legal principles' applicable in a civil suit differs significantly from that in a criminal trial." *Id.*

Although the difference in the burdens of proof at issue in *Neaderland* involved criminal and civil actions, the same principle is applicable where presumptions or standards of proof vary between two civil actions. *See* 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4422 at 590–91 (2002) ("The differences in gradations of civil standards of proof are more subtle than the shift from the reasonable-doubt standard to the preponderance standard, but the same basic principle continues to apply."). A number of courts have so held. In *Clark v. Bear Stearns & Co., supra,* for example, the defendant moved for summary judgment on the plaintiff's securities fraud claim, arguing that an earlier arbitration decision dismissing the plaintiff's common law fraud claim had collateral estoppel effect in the securities fraud suit. *See id.* at 1320. Denying the defendant's motion, the court noted that the burden of proof for common law fraud required clear and convincing evidence whereas proof of fraud claims under the securities laws required only proof by a preponderance of the evidence. *See id.* at 1322. The court concluded that "[b]ecause collateral estoppel does not preclude claims that have a different burden of proof than previously decided claims, a failure to prevail on a [common law fraud claim] would not preclude a fraud claim under federal law." *Id.* Similarly, in *Wilcox v. First Interstate Bank of Or., N.A.,* 815 F.2d 522 (9th Cir.1987), the Ninth Circuit affirmed a district court's refusal to apply collateral estoppel where the defendant argued that the plaintiff's failure to prove fraud in an earlier state action precluded the plaintiff from maintaining a subsequent RICO action based on the

same predicate act of fraud. *See id.* at 531–32. Noting that the plaintiff faced a stiffer, clear-and-convincing-evidence standard in the initial fraud action but only a preponderance-of-the-evidence standard in the subsequent RICO case, the court held that the plaintiff should not have been foreclosed from litigating its RICO claim. *See id. See also O'Neill v. Merrill Lynch, Pierce, Fenner & Smith,* 654 F.Supp. 347, 353 (N.D.Ill.1987) (acknowledging that the defendant could not invoke collateral estoppel in federal securities fraud action because plaintiff's burden in the earlier arbitration was higher than that which it faced in the subsequent federal suit).

■ Here, the plaintiffs' burden in the arbitration was less exacting than that which they shouldered in the district court. As set forth earlier, to prevail on their *Olech*-based equal protection claim in district court, the *plaintiffs* were required to prove by a preponderance of the evidence that the defendants intentionally treated Officers Cobb and Rouse differently from others similarly situated and that there was no rational basis for this differential treatment. While it is not entirely clear on whom the burden of proof fell at the arbitration, the language that the arbitrator used in his written decision strongly suggests that it was the *defendants* (and not the plaintiffs) who had the burden of proving that (1) the plaintiffs had disobeyed a direct order, and (2) the suspensions of the plaintiffs were supported by probable cause. For instance, the decision's conclusion notes that the *DOC*—not the plaintiffs—"was unable to provide substantial and credible evidence on the issues in dispute." The decision acknowledges that "while numerous elements of the requisite proofs were satisfied," the *DOC*—again, not the plaintiffs—failed to "directly link [the plaintiffs] to any misconduct." Highlighting the critical difference between the burdens shouldered by the plaintiffs in these two proceedings is the arbitrator's conclusion that "absent further proof that the [plaintiffs] committed an illegal act, they are *entitled to the presumption of innocence.*" (emphasis added).

The *defendants'* purported inability, before the arbitrator, to provide "substantial evidence" of misconduct or to directly link the plaintiffs to the alleged unlawful job action does not conclusively establish, in a subsequent proceeding where the *plaintiffs* shoulder the burden, that the suspensions were not supported by probable cause or that the plaintiffs did not participate in an unlawful job action. *See Restatement (Second) of Judgments* § 28, cmt. f (1982). Unlike the defendants' position in the arbitration, at *trial* they were under no obligation to show that the discipline they imposed was supported by substantial evidence. Rather, it was incumbent on the *plaintiffs* to show, by a preponderance of the evidence, that the defendants treated them differently from others similarly situated and that such treatment was not rational.

Even assuming that the plaintiffs bore the burden of proof in both proceedings, the arbitrator's according Officers Cobb and Rouse a "presumption of innocence" in rendering his decision is sufficient, by itself, to make the application of collateral estoppel inappropriate. Clearly, in pressing their claims in the district court, the plaintiffs were entitled to no such presumption. By instructing the jury that the findings of the arbitrator were binding on it, however, the district court in effect clothed the plaintiffs with the "presumption of innocence" to the plaintiffs' benefit. Therefore, we cannot say that the plaintiffs have carried their burden of demonstrating that the issues raised in both decisions are identical. Accordingly, the instruction was error.

### D. Was the Erroneous Jury Instruction Harmless?

"An erroneous instruction requires a new trial unless the error is harmless." *Gordon*, 232 F.3d at 116 (internal quotation marks and citation omitted). "An error is harmless only if the court is convinced that the error did not influence the jury's verdict." *Id.* Here, the plaintiffs argue that even if the district court's collateral estoppel instruction was error, such error was harmless. Because we believe that "[t]he jury might well have reached a different result had appropriate instructions been given," *Holzapfel v. Town of Newburgh*, 145 F.3d 516, 525 (2d Cir.1998), we disagree.

Throughout this litigation, the defendants have maintained that their decision to discipline the plaintiffs, as well as Officers Dorazio, Savino and Williams, was rational because they believed that the officers' refusal to work forced overtime, and their similar reasons for doing so, were indicative of a job action. Each of the findings that the jury was required to accept as binding informs the determination whether the defendants' decision to discipline the plaintiffs on this basis was rational or not. By according the arbitrator's findings collateral estoppel effect, the district court effectively precluded the jury from weighing any evidence that the defendants submitted in support of their theory, if that evidence was contrary to the arbitrator's findings. *Cf. Hathaway v. Coughlin*, 99 F.3d 550, 554 (2d Cir.1996) (finding that erroneous instruction was not harmless where its effect was to preclude jury from finding that plaintiff had established his claim "even if there was evidence" supporting it; noting that instruction "goes to the very heart of the plaintiff's claim, and effectively precludes a finding of liability where one may be warranted"). The defendants suffered prejudice as a result because, in several instances, the defendants did in fact submit evidence contrary to the findings made by the arbitrator. For example, a portion of the district court's erroneous instruction required the jury to find that "there was no evidence that the plaintiffs organized, took part in, or were aware of[,] any job action on July 14, 1999." While the arbitrator reached this conclusion after according the plaintiffs a presumption of innocence, the defendants presented considerable evidence from which the jury fairly could have reached the opposite conclusion.

First, Chief Miranda testified that on July 14, 1999, there were rumors circulating around the corrections facilities that a job action was in the works. He testified that he received information suggesting that officers who would normally volunteer to work overtime would either (1) not volunteer, or (2) put their names in the overtime log book to give the appearance of their willingness to work overtime, but then not answer their phones when called. Sergeant Reilly's affidavit was consistent with Chief Miranda's testimony. In it, Sergeant Reilly observed that there was a forty percent decrease in the number of overtime volunteers from July 13, 1999 to July 14, 1999. He also noted that at a pre-shift meeting, a COBA representative (later determined to be Officer Christopher Smith) advised fellow officers not to work overtime. His affidavit also makes reference to officers harassing their colleagues in retaliation for their colleagues' decisions to volunteer to take overtime shifts. Indeed, at trial, the defendants presented evidence, consistent with Sergeant Reilly's affidavit, that Officer John Minella assaulted a fellow officer, calling him a "scab" for his decision to volunteer for overtime.

While this evidence does not mandate a finding that an unlawful job action took

place, or was planned for July 14, 1999, it is· sufficient to support a jury's reaching such a conclusion. *Cf. Norville v. Staten Island Univ. Hosp.,* 196 F.3d 89, 101 (2d Cir.1999) (finding that erroneous jury instruction was not harmless where, under the proper instruction, "the jury might have found—though it would not have been compelled to find—" that the plaintiff had established her claim). If the jury was permitted to conclude that there was evidence of a job action prohibited by state law, it also would have been permitted to find that the defendants' decision to discipline the plaintiffs for their participation in such an action was not "irrational" under *Olech.*

Another portion of the district court's instruction required the jury to find that "there was no probable cause to suspend the plaintiffs without pay." Evidence offered by the defendants to show that there *was* probable cause to suspend the plaintiffs falls into two categories. First, the defendants placed particular emphasis on how unusual it was for *five* officers to claim physical exhaustion or discomfort at once after receiving orders to work forced overtime. Chief Miranda, for instance, testified that "it was peculiar that five officers [including the plaintiffs] would get tired spontaneously, at the same time, and say they couldn't work overtime." Echoing Miranda's testimony, County Executive Andrew Spano testified that it was "very unusual for five people to get sick at the same time" and that such a situation normally would not occur "unless [there was] contamination in the prison." Special Assistant Czarnecki offered similar testimony, explaining that it was "highly suspicious" that none of the five officers reported to his 11:00 p.m. to 7:00 a.m. shift supervisor that he was tired, exhausted or experiencing any physical discomfort. He added that the officers "seemed to·simultaneously [complain of exhaustion] only after

they were directed to work [the] overtime shift." . Sergeant Reilly's affidavit also provides support for these suspicions in its observation that, "on average, less than one officer per day who is asked to do overtime will refuse." The defendants also pointed out the similarities in the specials submitted by the five· officers who were suspended. As noted earlier, the specials of Officers Williams and Dorazio are virtually identical: each contains the exact same language and the exact same grammatical error.

Second, the defendants pointed out that despite the complaints of exhaustion and discomfort contained in the plaintiffs' specials, neither Officer Cobb nor Officer Rouse made any mention of these ailments prior to being asked to work overtime at the Jail, where the work was less desirable. For. example, although the DOC had a policy under which an officer could be relieved from duty if he was experiencing physical discomfort, Officer Cobb testified that he had not had occasion to use that procedure in the nine years he had worked as a corrections officer, including during the shift he completed without incident on July 14, 1999. It was only after Officer Cobb was asked to work at the Jail (where he admitted there were more "problems" and where, in his nine years as a corrections officer, he had *never* worked an overtime shift) that he complained of physical discomfort and exhaustion.

Officer Rouse's testimony also fits into the defendant's theory in· this respect. When Captain Sullivan first called Officer Rouse to ask if he wanted to work overtime at the Jail, rather than·explaining the "physical exhaustion" that he ·described moments later in his special, Officer .Rouse responded that he "didn't really feel ... like working." When Captain Sullivan subsequently "forced" him, Officer Rouse again said nothing about his physical ex-

haustion. It was only after Officer Rouse was seen with the other forced corrections officers and their COBA representative that Officer Rouse articulated his physical inability to work overtime at the Jail.

Also, after submitting his special to the superior officers at the Jail, Officer Rouse visited his doctor, who provided him with a note and recommended bedrest. Despite the physical exhaustion that had prevented him from working his overtime shift earlier that day, however, Officer Rouse went home and set his alarm so that he could wake up in time to coach a youth basketball game taking place on the night of July 14, 1999. While Officer Rouse was at the game, officials from the DOC went to his home to speak with him, presumably about his reason for not being able to work earlier that day. Although Sergeant Cipollone was able to confirm the validity of the note Officer Rouse obtained from his doctor, the above testimony could support (but, again, would not require) a finding that Officer Rouse's exhaustion was a convenient excuse not to work at the Jail.

The testimony of Captain Buch, the Penitentiary's administrative captain, also supports the defendants' claim that the suspensions were supported by probable cause. As detailed earlier, Officer Roger Smith, the COBA representative with whom the "forced" officers were seen after being ordered to work overtime, asked Captain Buch if those officers could perform their overtime shift at the Penitentiary instead of the Jail. While not conclusive, Captain Buch's testimony could permit the inference that the five officers would not have refused their overtime shifts if they could have performed those shifts at the Penitentiary rather than at the Jail.

Once again, the evidence detailed above does not *compel* a finding that there was probable cause to suspend Officers Cobb and Rouse or that the defendants' differential treatment of Officers Cobb and Rouse

was rational. However, had the jury not been instructed that there was *no* probable cause to issue the suspensions, we believe that this evidence could support a jury's reaching the opposite conclusion. *Cf. Girden v. Sandals Int'l*, 262 F.3d 195, 204–05 (2d Cir.2001) (where district court's erroneous instruction precluded jury from imposing liability on the basis of one account of an assault and where that account would have allowed for a finding of liability, erroneous instruction was not harmless); *Hudson v. New York City*, 271 F.3d 62, 71 (2d Cir.2001) (concluding that erroneous instruction was not harmless, noting that "[i]n light of this confusion, we do not know whether a correctly charged jury would have rendered a different verdict").

## CONCLUSION

For the foregoing reasons, we vacate the judgment and remand with directions to dismiss the plaintiffs' First Amendment and selective prosecution equal protection claims, and grant a new trial on the plaintiffs' *Olech*-based equal protection claim.

The parties shall bear their own costs.

