Jeremy SKEHAN, John Dicioccio, Peter Monachelli, and Paul Micalizzi, Plaintiffs–Appellees,

v.

The VILLAGE OF MAMARONECK, Philip Trifiletti, William J. Paonessa, Tony Vozza, Christie Derrico, John Angiletta, and Edward Flynn, Defendants–Appellants,

Reagan Kelly, James Gaffney, Robert Holland, Alexander Ricozzi, Mary Matero, Peter J. Primrose, Edward Flynn, Hank Paul, and Robert Cardillo, Defendants.

Docket Nos. 05–2084–CV(L), 05–2092–CV(CON).

United States Court of Appeals, Second Circuit.

Argued: Jan. 25, 2006.

Decided: Sept. 26, 2006.

Michael G. Santangelo, Servino & Santangelo, LLP, Hawthorne, NY, for Defendant–Appellant Edward Flynn.

Scott A. Korenbaum, Callahan & Fusco, LLC (Christopher G. Fusco, on the brief), New York, NY, for Defendants–Appellants the Village of Mamaroneck, Philip Trifiletti, William J. Paonessa, Tony Vozza, Christie Derrico, and John Angiletta.

Jonathan Lovett, Lovett & Gould, LLP (Drita Nicaj, on the brief) White Plains, NY, for Plaintiffs–Appellees.

Before: WALKER, Chief Judge, LEVAL and SOTOMAYOR, Circuit Judges.

JOHN M. WALKER, JR., Chief Judge:

This case concerns charges and counter-charges of official misconduct within the police department of the Village of Mamaroneck ("the Village") and an alleged effort by the chief of police and the governing commission to silence subordinates. The plaintiffs, all former officers of the department, allege that the Chief of the department, Edward Flynn, and the Board of Police Commissioners ("the Board") conspired to retaliate against them because the plaintiffs spoke out against what they claimed was a pattern of serious misconduct by fellow officers and subsequent cover-ups by Chief Flynn and other high-ranking officers. The plaintiffs sued the defendants under 42 U.S.C. § 1983, alleging a violation of their First Amendment and Equal Protection rights.

The district court denied summary judgment to the Village, the Board, and Chief Flynn, including, as to Chief Flynn and the Board, summary judgment based on claims of qualified immunity. The individual Board members and Chief Flynn seek immediate review of the denial of qualified immunity, and the Village asks that we exercise pendent appellate jurisdiction over its appeal.

## BACKGROUND[1]

### I. The Greenland Incident

Sometime in 2002, plaintiff Jeremy Skehan and fellow police officers in the Mamaroneck Police Department responded to a call at an A & P Supermarket in Mamaroneck that resulted in a confrontation with Ronald Greenland, a black male. According to Skehan, Greenland was known as a felon with a history of violence who had threatened several members of the department. On February 5, 2003, Skehan, at a meeting with the department's executive officer, Alexander Ricozzi, and lieutenants Hank Paul and Mary Matero, was told to ignore any future violations by Greenland because Skehan is white and Greenland black. The officers said that if Skehan failed to obey the order he would be disciplined.

Days later, at a meeting attended by Chief Flynn, Skehan, Ricozzi, and Matero, Flynn rescinded the previous order and asked if Skehan wanted to express any concerns about the incident. Skehan replied that he was concerned that the department was making its enforcement decisions concerning Greenland on the basis of race. Flynn immediately said Skehan was mistaken; he added, "your judgment needs to be looked at a little bit because I think you have a problem with your judgment." Flynn then told Skehan that Flynn was proposing that Skehan forfeit ten days' pay because of Skehan's failure to disclose the reason for taking a previous period of sick leave. When Skehan refused to consent to the forfeiture, the department issued a series of memoranda

---

1. As will be explained, see infra at 11–12, for purposes of this appeal, by reason of the defendants' provisional stipulation, all the plaintiffs' allegations are assumed to be true, and disputed factual issues are resolved in the plaintiffs' favor.

accusing Skehan of misconduct and suspending certain of Skehan's privileges, including switching shifts with other officers without approval. On March 3, Chief Flynn proposed eight disciplinary charges against Skehan, and Skehan was formally charged on April 7. Charges 1–7 alleged that Skehan refused to provide the department with information concerning his sick leave. Charge 8 alleged that Skehan had failed to report promptly to the February 5 meeting.

## II. The G.A. Incident

On May 2, Officer Reagan Kelly of the department responded to a two-car accident in the Village. The drivers were Doris Hutchinson and a minor, referred to only as G.A. At the scene, Kelly arrested G.A. for driving while intoxicated. Soon after, Skehan assisted Kelly with the preparation of the bill of particulars to be filed against G.A. Kelly confided to Skehan that Kelly did not have probable cause to arrest G.A. for the offense but that he was directed to do so by Sergeant Gaffney, who "had gone off on his tangent again because he doesn't like kids and he gets really nutty, and . . . he went nuts again."

On May 13, Skehan met privately with an Assistant District Attorney, Jeffrey Chartier, to report Kelly's allegations and Skehan's own concerns about racial decisionmaking in the department. Skehan told Chartier that he feared the incidents would have been covered up if he had gone through the normal chain of command. The next day, Skehan reported his conversation with the District Attorney's office to Lieutenant Paul. Later that month, Skehan wrote to Sergeant Peter Monachelli, his direct supervisor, advising Monachelli of his meeting with the District Attorney's Office and his concerns about the conduct within the department.

Monachelli, who was also vice president of the local Police Benevolent Association ("PBA"), forwarded Skehan's memorandum to Monachelli's immediate supervisor, Lieutenant Matero. The next day, Monachelli drafted his own memorandum to Matero, expressing his concern that the department was making enforcement decisions on the basis of race.

On May 27, an internal investigation prompted by Skehan's allegations concerning the G.A. accident was concluded and exonerated Sergeant Gaffney. That same day Gaffney required all the officers to attend a roll call meeting where he threatened retaliation against Skehan, saying, "I want everyone to know, now that it's over, it's just beginning."

Two days later, Skehan wrote to local PBA president John DiCioccio, reiterating his concerns. In their capacities as president and vice president of the PBA, respectively, DiCioccio and Monachelli posted a memorandum, dated May 30, in the police locker room. The memorandum disputed the conclusions of the internal investigation into Sergeant Gaffney's conduct concerning the arrest of G.A. It also reiterated and supported Skehan's contention that the department was engaged in race-based enforcement. DiCioccio and Monachelli sent a copy of their memorandum to the Board and Chief Flynn.

## III. The Department's Retaliation and Plaintiffs' Lawsuit

The next day, Acting Chief Ricozzi, with Chief Flynn's authorization, suspended Skehan without pay for making false and improper allegations about other officers to the District Attorney. A copy of the suspension notice was sent to the Board. By letter dated June 9, Flynn urged the Board to continue Skehan's suspension pending the completion of the investigation

of Skehan. All five members of the Board voted to continue the suspension.

On June 4, Chief Flynn published a memorandum, with copies to the Board, outlining his response to DiCioccio and Monachelli's memorandum. In it, Chief Flynn promised action against DiCioccio and Monachelli. A month later DiCioccio was interviewed by Chief Flynn concerning the May 30 memorandum. When DiCioccio was asked to remove his firearm, he dropped his gunbelt to the floor in a show of disrespect for the investigation. On the advice of counsel, DiCioccio refused to answer any questions related to the PBA memorandum. On July 8, Chief Flynn leveled disciplinary charges against DiCioccio for his refusal to answer questions at the hearing and dropping his gunbelt and then suspended him without pay. The Board unanimously voted to continue DiCioccio's suspension on July 18. Also on July 8, Chief Flynn served Monachelli with a notice to appear. His interview was conducted the following day and was continued to July 30; like DiCioccio, Monachelli refused to answer questions concerning the May 30 PBA memorandum. Skehan's disciplinary proceeding began on July 17.

On August 8, Skehan filed this action in the Southern District of New York against Flynn and the Board members, as well as other officers who are not appellants. On September 8, DiCioccio and Monachelli filed a separate action. The same day, Flynn sent a memorandum to the Board explaining that he was instituting disciplinary charges against Monachelli. Monachelli was charged with refusal to answer questions during the investigation, posting of the May 30 PBA memorandum, and discussing the memorandum with third parties. Monachelli was not suspended but was relieved of supervisory responsibilities. Because of a perceived conflict of interest, the Board appointed a retired New York State Supreme Court Justice, James R. Cowhey, to hear the charges against Skehan, DiCioccio, and Monachelli.

On February 14, 2004, Paul Micalizzi, a Mamaroneck police officer, wrote to the Board, expressing his belief that the charges against Skehan, DiCioccio, and Monachelli were unjustified and that their complaints against the department were well-founded. Micalizzi further alleged that Chief Flynn had filed the charges to retaliate against and silence the officers. Micalizzi testified on behalf of Skehan, DiCioccio, and Monachelli during their disciplinary hearings in March and April 2004. On April 7, Chief Flynn filed disciplinary charges against Micalizzi and suspended him without pay. The charges alleged that Micalizzi had tape recorded conversations with the mayor of Mamaroneck and police department officials in violation of department policy. Flynn also wrote the Board to recommend that they continue the suspensions of Skehan and DiCioccio and that they suspend Monachelli and Micalizzi until the disciplinary proceedings were completed. At about that time, the Board voted to suspend Micalizzi pending the outcome of the investigation but reinstated him on July 15. There is no record that Monachelli was suspended. On April 19, Micalizzi filed a lawsuit in the Southern District of New York against Chief Flynn, the Board, and other officers no longer party to this suit.

IV. The Disciplinary Proceedings

Justice Cowhey's hearing of the charges against all the plaintiffs was completed in the fall of 2004. He found that Skehan, DiCioccio, and Monachelli were guilty of all charges, and that Micalizzi was guilty of four of the five counts of tape recording without authorization. Because the plaintiffs also had sued the Village Manager,

Leonard Verrastro, who had been appointed by the Board to be the final decisionmaker in the plaintiffs' case, Verrastro recused himself. The Board then appointed Justice Cowhey in his place. On January 20, 2005, Justice Cowhey terminated each plaintiff from the department.

## V. The District Court Proceedings

District Judge Brieant consolidated into a single action the complaints filed by the four plaintiffs. The substance of their claims, brought under 42 U.S.C. § 1983, was that they had been retaliated against in violation of the First Amendment and that they had been disciplined more harshly than other similarly-situated officers in violation of the Equal Protection clause. *See* U.S. Const. amends. I, XIV. Chief Flynn, the Village, and the Board moved for summary judgment, with the individual defendants asserting a qualified immunity defense.

The district court rejected all of the defendants' arguments and denied summary judgment. As to Chief Flynn, the district court found sufficient evidence that he was personally involved in the suspension of the officers, that it was clearly established that a government official could not discipline an inferior officer because of that officer's expression of protected speech, and that the motive for Chief Flynn's actions presented a question of fact "particularly ill-suited for summary judgment." The district court also found evidence sufficient to create a jury question as to whether Flynn disciplined Skehan and the other plaintiffs more severely than similarly-situated offenders. The district court therefore denied Flynn's motion for qualified immunity as to both constitutional claims.

As to the Board, the district court held that the evidence was sufficient to suggest that the Board knew of Chief Flynn's un-constitutional actions and "ratified" them. In the district court's view, this ratification was sufficient for liability to attach under § 1983. The district court denied qualified immunity to the Board members, holding that the Board was required to do more than "rubber-stamp[ ]" Flynn's decision to discipline the officers because the Board had more than adequate knowledge of Flynn's possibly unconstitutional motivation. With regard to the Village, the district court held that, because the Board was the final policymaker for the Village, the Village could be liable for the actions of the Board.

## DISCUSSION

### I. Jurisdiction

■ The denial of a motion for summary judgment is not usually immediately appealable. *See* 28 U.S.C. § 1291; *O'Bert v. Vargo*, 331 F.3d 29, 38 (2d Cir.2003). Under the "collateral order" doctrine, however, the denial of a motion for qualified immunity is immediately appealable to the extent that the denial turns only on a question of law. *Poe v. Leonard*, 282 F.3d 123, 131 (2d Cir.2002). In this case, the district court found that issues of material fact remained in dispute between the parties, including the defendants' motivation for bringing charges against the plaintiffs. Thus, at least in part, the district court's denial of summary judgment and its rejection of the defendants' qualified immunity defense turns on disputed issues of fact, and we would ordinarily lack jurisdiction to review those denials here.

■ Nevertheless, defendants may appeal from denials of qualified immunity if they are willing, for the purposes of appeal only, to pursue the appeal on the basis of stipulated facts or the facts as alleged by the plaintiff. Alternatively, the defendants may appeal if they assume that

all the facts that the district court found to be disputed are resolved in the plaintiff's favor. *Salim v. Proulx*, 93 F.3d 86, 90(2d Cir.1996). While we may not inquire into the district court's determination that there was sufficient evidence to create a jury question, we may resolve whether, as a matter of law, the defendants are entitled to qualified immunity either because the law was not clearly established or because, on the facts assumed for the purposes of appeal, the defendants' conduct did not constitute a violation of a constitutional right. *Id.; see Poe*, 282 F.3d at 131–32. Both Chief Flynn and the members of the Board are entitled to assert a qualified immunity defense, *see Harlow v. Fitzgerald*, 457 U.S. 800, 807, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), and to pursue an immediate appeal under the appropriate circumstances, which are present here. We therefore have jurisdiction to hear their appeal, with the limitations imposed by *Salim* that we must accept the plaintiffs' version of the disputed facts and cannot examine the sufficiency-of-the-evidence determinations made by the district court.

■ The Village is not entitled to claim qualified immunity, *Owen v. City of Independence*, 445 U.S. 622, 650, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), and thus may not normally appeal the district court's denial of summary judgment as to it. The Supreme Court has cautioned that there is no general appellate jurisdiction to consider issues related to claims that are capable of interlocutory appeal. *See Swint v. Chambers County Comm'n*, 514 U.S. 35, 50–51, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995). We may consider only such issues as are "inextricably intertwined," *Munafo v. Metro. Transp. Auth.*, 285 F.3d 201, 215 (2d Cir.2002), with matters over which we do have jurisdiction—that is, matters where "no additional inquiry or analysis is necessary," and issues necessary to ensure

meaningful review of the jurisdictionally proper elements of the case. *McCullough v. Wyandanch Union Free Sch. Dist.*, 187 F.3d 272, 277, 282 (2d Cir.1999). For reasons that we will discuss, we find that we lack jurisdiction to consider that part of the Village's appeal related to plaintiff's First Amendment claim but do have jurisdiction to consider the Village's appeal concerning the plaintiffs' Equal Protection claim. Accordingly, we dismiss the Village's appeal on the First Amendment claim.

## II. First Amendment Claims

Plaintiffs argue that Chief Flynn and the Board charged them with violations of departmental rules and suspended them in retaliation for their protected speech against race-based decisionmaking and cover-ups of misconduct within the department. On plaintiffs' view, Chief Flynn suspended Skehan because Skehan complained about the Greenland incident and reported the questionable G.A. arrest to the District Attorney. When DiCioccio and Monachelli supported Skehan by expressing their concerns to the Board and posting the PBA memo, Flynn brought charges against them, and the Board suspended DiCioccio pending the investigation. Because Micalizzi attempted to support the other plaintiffs by testifying in their favor at their hearings, Flynn and the Board then suspended him.

■ The Supreme Court recently held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, — U.S. —, —, 126 S.Ct. 1951, 1960, 164 L.Ed.2d 689 (2006). If a public employee is not speaking pursuant to his official duties, the anal-

ysis is different: "[A]lthough a governmental entity enjoys significantly greater latitude when it acts in its capacity as employer than when it acts as sovereign, the First Amendment nonetheless prohibits it [generally, subject to certain defenses,] from punishing its employees in retaliation for the content of their speech on matters of public importance." *Munafo*, 285 F.3d at 211. In order to establish a First Amendment retaliation claim, plaintiffs must prove that: (1) they engaged in constitutionally protected speech because they spoke as citizens on a matter of public concern; (2) they suffered an adverse employment action; and (3) the speech was a "motivating factor" in the adverse employment decision. *Gronowski v. Spencer*, 424 F.3d 285, 292 (2d Cir.2005); *Sheppard v. Beerman*, 94 F.3d 823, 827 (2d Cir.1996) (the speech must be "at least a substantial or motivating factor") (internal quotation marks omitted); *Lewis v. Cowen*, 165 F.3d 154, 163 (2d Cir.1999). Whether the speech addresses a matter of public concern is a question of law to be decided by the court. *Gronowski*, 424 F.3d at 292. In addition, plaintiffs must show that each defendant "was personally involved ... in the alleged constitutional deprivations." *Id.* at 293. If a plaintiff makes this required showing, defendants may nevertheless escape liability if they can demonstrate that either (1) the defendant would have taken the same adverse action against the plaintiff regardless of the plaintiff's speech; or (2) the plaintiff's expression was likely to disrupt the government's activities and that the harm caused by the disruption outweighs the value of the plaintiff's expression. *Cobb v. Pozzi*, 352 F.3d 79, 91 (2d Cir.2003). The government defendants do not argue on this appeal that the plaintiffs' expression would have caused a disruption that outweighed the value of plaintiffs' speech. *See Reu-*

*land v. Hynes*, 460 F.3d 409, 415 (2d Cir. 2006).

Defendants concede that *Garcetti* does not affect Micalizzi's claims and do not seriously contend that Monachelli and DiCioccio's posting in the department locker room of a memo in their capacities as leaders of the PBA is not protected speech under *Garcetti*. As to Skehan, defendants argue that his reports to the District Attorney's office of an arrest made without probable cause and of race-motivated law-enforcement decisions were made pursuant to his official duties as a police officer. Because no factual record has been developed on the scope of Skehan's duties, we express no view on this question and leave to the district court in the first instance to consider the application of *Garcetti* to Skehan's claims and any others that may be relevant.

 As for the claim that plaintiffs were speaking as citizens on a matter of public concern, defendants do not seriously contest that plaintiffs have satisfied the first two elements of their First Amendment case, nor could they. Plaintiffs' speech plainly concerned issues of public concern: misfeasance within the police department and allegations of an ongoing cover-up and an attempt to silence those who spoke out against it. *Cf. Feingold v. New York*, 366 F.3d 138, 156–57 (2d Cir. 2004) (complaint of discriminatory treatment is a matter of public concern); *Munafo*, 285 F.3d at 212 (safety of the workplace and union activities); *Hale v. Mann*, 219 F.3d 61, 71 (2d Cir.2000) (administration of juvenile detention facilities). Likewise, the institution of disciplinary proceedings is sufficient in this circuit to constitute an adverse employment decision. *See Burkybile v. Bd. of Educ.*, 411 F.3d 306, 313–14 (2d Cir.2005).

The questions remain whether plaintiffs were in fact disciplined because of their

constitutionally protected speech and, if so, which defendants were personally involved in that decision. Chief Flynn contends that he had legitimate, constitutionally permissible reasons for charging the plaintiffs. The Board and Village contend that their constitutional duties were fulfilled by instituting the hearing process whether or not Chief Flynn charged and suspended the plaintiffs for unconstitutional reasons.

### A. Qualified Immunity

■ Chief Flynn and the Board members are entitled to assert a qualified immunity defense; persons entitled to qualified immunity are immune from liability for damages under § 1983. In conducting the qualified immunity inquiry, a court must first decide if the facts alleged make out the deprivation of a constitutional right. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If those facts would constitute a deprivation, the court should grant qualified immunity if (1) the legal right said to be violated was not clearly established at the time of the defendant's conduct; or (2) the defendant's action was objectively reasonable in light of the clearly established legal rules then in effect. *O'Bert,* 331 F.3d at 36; *see Saucier,* 533 U.S. at 201–02, 121 S.Ct. 2151.

### 1. Chief Flynn

■ Applying the qualified immunity principles to Chief Flynn, the district court was plainly correct to deny Flynn's motion for summary judgment. First, as a general proposition (with some exceptions, *see, e.g., Pickering v. Bd. of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) (adverse action may be taken if employee's speech is disruptive); *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (adverse action may be taken against policymaker); *Mount*

*Healthy Sch. Dist. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (adverse action may be taken if for other lawful reasons it would have been taken "in the absence of the protected speech")), governmental entities may not inflict an adverse employment decision upon an employee in retaliation for the employee's exercise of his First Amendment rights. Moreover, that right was clearly established by 2002 and 2003, the period of time where Flynn allegedly retaliated against the plaintiffs. *See Munafo,* 285 F.3d at 211. In our view, no reasonable officer could hold a contrary belief.

■ Flynn's principal contention on appeal is that he had constitutionally permissible reasons for charging and suspending the plaintiffs. In addition, Flynn contends that he was not personally responsible for the suspensions of those plaintiffs who were suspended in the first instance by the Board. The latter contention is inapposite to the present appeal—the retaliatory proffering of charges is sufficient to constitute an adverse employment decision for First Amendment purposes. *See Burkybile,* 411 F.3d at 313–14. Similarly, Flynn's argument that he had other, non-retaliatory reasons for disciplining the plaintiffs is beside the point. So long as Flynn's alleged animus was "a substantial or motivating factor" behind Flynn's decision, *Sheppard,* 94 F.3d at 827(internal quotation marks omitted), the fact that he had other legitimate reasons is irrelevant; because the plaintiffs allege that Flynn's motivation was unconstitutional and the district court found the issue to be disputed, we must accept the plaintiffs' version of the facts. To the extent that Flynn is also arguing that the evidence submitted at summary judgment was insufficient to create a disputed issue of fact on the question, we lack jurisdiction to consider his argument. *See Locurto v.*

*Safir*, 264 F.3d 154, 167 (2d Cir.2001) (stating that we lacked jurisdiction "to review the district court's First Amendment ruling [because it would] require us to review [the district court's] determination that sufficient evidence existed to create a genuine issue of fact on the question of subjective motivation"); *Salim*, 93 F.3d at 90–91. Similarly, we must accept the plaintiffs' allegations that Flynn would have not taken the same adverse action in the absence of plaintiffs' protected expression. *See Mount Healthy Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

We therefore affirm the district court's denial of summary judgment and qualified immunity as to Chief Flynn on plaintiffs' First Amendment claim.

### 2. The Board

As we have explained, retaliatory action against the plaintiffs is unconstitutional, and this was clearly established at the time of the relevant conduct. The Board contends, however, that, even assuming that it reasonably suspected or even knew outright that Chief Flynn's motivation for disciplining the plaintiffs was unconstitutional retaliation, it had no duty other than to investigate the charges impartially and thoroughly, which it did by conducting the disciplinary hearing required by law.

■■■ While we disagree with the district court's analysis of this claim,[2] we believe that the plaintiffs have alleged a different and legally adequate basis for Board liability. There is no dispute that the Board's "direct participation" in violat-

ing the plaintiffs' rights would be a proper basis for liability. *Provost v. City of Newburgh*, 262 F.3d 146, 154 (2d Cir.2001) (a supervisory defendant may be held liable if it "personally participated in the alleged constitutional violation"). Again, whether the district court was correct in finding sufficient evidence to create a jury question on this issue is not before us. However, assuming that the district court was correct, as we must, we agree that if the Board, apart from Flynn, charged and suspended the plaintiffs, at least in part, to punish them for the exercise of their constitutional rights, a legally adequate theory for liability under § 1983 would be presented. Moreover, we are certain that such a theory was clearly established by 2002. *See id.; Moffitt*, 950 F.2d at 886(liability "may be premised on [the supervisors'] knowledge of the activities of [their subordinates] and a resulting direct participation therein").

We therefore affirm the judgment of the district court denying qualified immunity to the Board on the basis that, taking the allegations in plaintiffs' favor, the Board intended to further Chief Flynn's desire to retaliate against the plaintiffs for their exercise of First Amendment rights.

### B. Municipal Liability

■■■ Municipalities may be held liable under § 1983, but they may not be held liable for the actions of their officers on a theory of *respondeat superior*. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Rather, municipal liability attaches only where the deprivation was caused by a

---

**2.** We agree with the Board that, even assuming it was aware of Chief Flynn's allegedly retaliatory reason for bringing charges against the plaintiffs, the Board was under no additional duty to screen those charges before conducting the hearing. The disciplinary hearing exists for the purpose of inquiring into the substantiality of the charges proffered. By instituting a disciplinary hearing, far from participating personally in a deprivation of a constitutional right, the Board was taking steps to remedy any wrong that may have occurred.

policy or custom of the municipality or by a municipal official "responsible for establishing final policy." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Municipalities are not entitled to qualified immunity for their actions, even where the individual officers who acted on the municipality's behalf would be. *Owen*, 445 U.S. at 657, 100 S.Ct. 1398. Where the plaintiffs contend that the constitutional deprivation was caused by an actor with final policymaking authority, the question of which municipal officials are the final policymakers is one of law, and the question is resolved by looking to relevant state law. *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000) (citations omitted).

The Village does not question the district court's determination that the Board is the final policymaker of the Village for purposes of police discipline and supervision. It nevertheless asks us to determine whether municipal liability may attach through the actions of the Board members. We lack jurisdiction to consider this issue on interlocutory appeal.

In *Swint*, the Supreme Court was faced with a nearly identical procedural situation: individual executive officers were plainly entitled to an immediate interlocutory appeal from the denial of their motions for qualified immunity. The municipality sought to appeal as well, disputing the district court's determination that the individual officers were the final policymakers under state law. *Swint*, 514 U.S. at 40, 115 S.Ct. 1203. The Eleventh Circuit purported to exercise pendent appellate jurisdiction over the municipality's appeal, but the Supreme Court vacated that decision. It held that appellate jurisdiction does not exist over all aspects of a case simply because it exists over some. While it did not attempt to determine all the cases in which pendent appellate juris-

diction would be available, it did note that the municipality's appeal was not

> inextricably intertwined with that court's decision to deny the individual defendants' qualified immunity motions, or that review of the former decision was necessary to ensure meaningful review of the latter. Nor could the parties so argue. The individual defendants' qualified immunity turns on whether they violated clearly established federal law; the county commission's liability turns on the allocation of law enforcement power in Alabama.

*Id.* at 51, 115 S.Ct. 1203.

The Village's situation is similar, but not identical, to that of the county commission in *Swint*. While we plainly have jurisdiction to review the Board's entitlement to qualified immunity, the Village's liability involves the distinct question of the Board's powers under New York law. This case differs from *Swint*, however, in that the Village concedes that the Board is the final policymaker for purposes of police supervision and discipline. Nevertheless, we have read the Supreme Court's limitation on pendent appellate jurisdiction "restrictively," and we are not persuaded that the Village's appeal, even in light of the Village's concession, is "inextricably intertwined with" or "necessary to ensure meaningful review of" the individual defendants' qualified immunity motions. *Rein v. Socialist People's Libyan Arab Jamahiriya*, 162 F.3d 748, 758 (2d Cir. 1998) (internal quotation marks omitted). Resolving an appeal like the Village's would ordinarily involve a separate further inquiry into issues of state law, and we do not see our review of the jurisdictionally proper aspects of this case as handicapped by our failure to review the Village's appeal. Given the similarity of this case and *Swint*, we must dismiss the Village's ap-

peal as to plaintiffs' First Amendment claim.

## III. Equal Protection Claims

Plaintiffs Skehan and Micalizzi also allege that Chief Flynn, the Board, and the Village violated their Equal Protection rights. They assert a selective treatment claim, alleging that they were disciplined more harshly than other police officers who committed similar violations of departmental rules. *See Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir.2005). We have recounted above the nature of the charges filed against Skehan and Micalizzi. In sum, Skehan was charged with failure to give information relating to his sick leave and reporting false allegations outside the department. Micalizzi was charged with unauthorized tape recording of conversations with senior Village officials.

The plaintiffs claim that the proffer of these charges was discriminatory and offer several examples of other officers receiving relatively minor discipline for offenses they claim were as severe or more severe than their own. As our review is limited to the legal sufficiency of the plaintiffs' claims, it is not necessary to detail here the compared conduct of other officers. Among other instances, however, the plaintiffs allege that one officer was not disciplined for discharging his weapon in the police locker room or, in a separate incident, after he was detained for illegal operation of a jetski while in the company of two underage women. They also allege that this same officer was given only a five-day suspension for allegations of forcible sodomy of a civilian. Finally, they allege that several officers, who reported to duty in an intoxicated state, were never disciplined.

To prevail on a selective treatment claim, a plaintiff must show that (1)

he was treated differently from other similarly-situated individuals; and (2) the differential treatment was based on " 'impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.' " *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir.2001) (quoting *LaTrieste Rest. & Cabaret v. Vill. of Port Chester*, 40 F.3d 587, 590 (2d Cir.1994) (internal quotation omitted)). In establishing the similarly-situated element, we have warned that "the level of similarity between plaintiffs and the persons with whom they compare themselves must be extremely high." *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir.2005). A plaintiff must show that (1) "no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and [ (2) ] the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake." *Id.* at 105.

### A. Qualified Immunity

#### 1. Chief Flynn

As we have noted, there is no question that plaintiffs have alleged a legally sufficient case as to the animus element. As we discussed above, on the plaintiffs' view, Chief Flynn disciplined the plaintiffs and brought them before the Board because they exercised their First Amendment rights. The district court's decision that the evidence was sufficient for a jury to find that other officers had in fact engaged in other misconduct and were disciplined differently than plaintiffs is not before us. *See Salim*, 93 F.3d at 90. We cannot review the district court's determination that a genuine issue of material fact exists

as to whether other officers committed other misconduct and were disciplined differently than plaintiffs. We can review only the purely legal question of whether, on plaintiffs' version of the facts of what these other officers did and how they were disciplined, a jury could conclude as a matter of law that the other officers were similarly situated to plaintiffs. *Id.* Because Chief Flynn does not argue that the other officers were not similarly situated to the plaintiffs as a matter of law, we do not reach this issue here. We note, however, that the district court did not articulate what standard it used in evaluating whether the plaintiffs were similarly situated to other officers. On remand, the district court should consider our discussion here and our decisions in *Harlen Associates* and *Neilson* in deciding whether sufficient evidence of similarity exists to make out a jury question.

■ In any event, we agree with the district court that no reasonable state employee could think that he was allowed to discipline an employee more severely because of the employee's expression of his First Amendment rights. We decided *Harlen Associates* in 2001. Moreover, we have articulated specifically the elements of a selective treatment claim in the context of police investigations in a case decided in 2000. *See Diesel v. Town of Lewisboro,* 232 F.3d 92, 103 (2d Cir.2000). In sum, if Chief Flynn brought the plaintiffs before the Board because the plaintiffs exercised their First Amendment rights and did not charge or discipline other similarly-situated officers, Chief Flynn violated plaintiffs' Equal Protection rights and is not entitled to qualified immunity.

We therefore affirm the judgment of the district court on this count but with the caution that, in order to prevail, the plaintiffs must demonstrate that they were sim-ilarly situated with comparable officers within the meaning of our caselaw.

### 2. The Board

■ Plaintiffs' allegations of Equal Protection violations by the Board are similar: that the Board instituted disciplinary proceedings and suspended the plaintiffs' while it had not taken such severe steps with regard to other similarly-situated officers. The Board contends that this count is inadequately pled because none of plaintiffs' allegations of disparate treatment involve the Board. While the plaintiffs were brought before the Board by Chief Flynn, all of the other incidents of misconduct were handled within the department, without Board involvement.

■ We agree with the Board. A plaintiff "cannot establish an equal protection violation unless [he] shows that the [defendant] consciously applied a different standard of enforcement to similarly[-]situated [individuals]." *LaTrieste Rest. & Cabaret, Inc. v. Vill. of Port Chester,* 188 F.3d 65, 70 (2d Cir.1999). The plaintiffs have not alleged that the Board had an independent duty to enforce departmental disciplinary policy or that the Board expressly or impliedly acquiesced in Chief Flynn's lenient treatment of other officers before acting more harshly with regard to the plaintiffs. Their sole contention, as far as we can tell, is that the Board overreacted in disciplining them. That may be true, but unless the Board also consciously applied a different standard to other similarly-situated officers, the Board has not violated plaintiffs' Equal Protection rights. *See Diesel,* 232 F.3d at 104–05. Plaintiffs would need to show that the Board consciously applied two different standards to its disciplinary decisions with respect to similarly-situated officers. We see no basis for Board liability simply because Chief Flynn, without the Board's acquiescence,

treated other officers more leniently than he or the Board treated the plaintiffs. Put another way, we do not think that the Equal Protection Clause required the Board, which was not involved in the compared disciplinary decisions, to treat the plaintiffs as leniently as Flynn treated other officers. Violations of Equal Protection are based on comparative treatment—if the Board itself never dealt with the previous officers' conduct, it could not treat the plaintiffs here disparately.

We therefore reverse the judgment of the district court on this count and order that it be dismissed.

### B. The Village

■ Unlike the First Amendment count discussed above, we do not believe that *Swint* precludes us from examining the district court's judgment denying the Village summary judgment on the Equal Protection count. On the plaintiffs' theory of the case, the only way the Village can be liable is due to the conduct of the Board, the final policymaker in the area of police supervision and discipline. The Board, however, cannot be held liable on an Equal Protection theory as the complaint stands. Therefore, it is not possible for the Village to be held liable on the Equal Protection claim either. On remand, the district court would, as a matter of logic, be required to dismiss it.

■ We see no reason not to take that step ourselves. As we have previously said, pendent appellate jurisdiction is appropriate where "[t]here is sufficient overlap between the qualified immunity issue and the issue raised by the remaining [defendants] ... because no additional inquiry or analysis is necessary." *Munafo*, 285 F.3d at 215; *see Rein*, 162 F.3d at 758. There is no reason not to examine a matter pendent to our proper jurisdiction when the jurisdictionally proper elements of our decision have necessarily decided the pendent matter. Thus, where a court grants summary judgment to the individual defendants based on their qualified immunity on the grounds that the defendants did not violate the plaintiffs' constitutional rights, and that ruling necessarily forecloses a finding of municipal liability, a court may exercise its pendent appellate jurisdiction and reverse the denial of the municipality's summary judgment motion, as well. *See Clubside v. Valentin*, 463 F.3d 199, 218 (2d Cir.2006); *McCullough*, 187 F.3d at 282. This is such a case: our decision that plaintiffs' claim against the Board cannot proceed necessarily disposes of the claim against the Village. "[N]o additional inquiry or analysis is necessary" to resolve this issue. *McCullough*, 187 F.3d at 282. Our jurisdiction is therefore proper, and we dismiss the Equal Protection claim against the Village.

## CONCLUSION

For the reasons set forth above, we AFFIRM the district court's denial of summary judgment as to Chief Flynn on both counts and as to the Board on the First Amendment count. We REVERSE the district court's judgment as to the Board and the Village on the Equal Protection claim and order these claims dismissed. Finally, we DISMISS the Village's appeal of the district court's denial of summary judgment as to the First Amendment claim for lack of jurisdiction. The case is REMANDED to the district court. No costs.